[Cite as *In re S.L.*, 2013-Ohio-781.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

|  |  |  |
|---|---|---|
| IN THE MATTER OF: | : | |
| | | CASE NOS. CA2012-07-137 thru 142 |
| S.L., et al. | : | CA2012-07-147 thru 149 |
| | : | O P I N I O N<br>3/6/2013 |
| | : | |
| | : | |

APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. JN2009-0234

Steven R. Sharpe and Sarah A. Smith, 10 Journal Square, 3rd Floor, Hamilton, Ohio 45011, for appellants, children

Helen Kendrick, 8050 Beckett Center Drive, Suite 202, West Chester, Ohio 45069, Guardian Ad Litem for children

Amy R. Ashcraft, 240 East State Street, Trenton, Ohio 45067, for appellant, mother

Richard N. Koehler, II, 205 Society Bank Building, 6 South Second Street, Hamilton, Ohio 45011-2729, Guardian Ad Litem for mother

Heather Felerski, P.O. Box 181342, Fairfield, Ohio 45018, for appellant, father

Michael T. Gmoser, Butler County Prosecuting Attorney, Government Services Center, 315 High Street, 11th Floor, Hamilton, Ohio 45011, for appellee, Children Services

Paul Becker, 1733 South Breiel Boulevard, Middletown, Ohio 45044, for appellees, D.C. and S.C.

**S. POWELL, J.**

{¶ 1} Appellants appeal a decision of the Butler County Court of Common Pleas, Juvenile Division, granting permanent custody of three children to the Butler County Department of Job and Family Services, Children Services Division (BCDJFS).

<u>Background and Complaint</u>

{¶ 2} BCDJFS filed a complaint on July 8, 2009 alleging three children, ages 6, 7 and 8, were neglected and dependent. The complaint stated that in 1995, the mother's parental rights to her oldest child, who has a different father, were terminated due to severe sexual abuse by a maternal aunt. In 1999, the parents' oldest child, a full-sibling of the children in this case, was removed from the parents' home in Tennessee due to neglect and the parents' rights to the child were terminated.

{¶ 3} According to the complaint, the agency had prior contacts with the family regarding the ability of the mother, who has a low IQ, to parent the three children in this case effectively. On February 17, 2009, the agency received a report of neglect involving the three children. When agency workers met with the mother, they discovered the home was cluttered and had a strong odor of cat urine and that the children had decaying and black teeth. The complaint indicated that service providers reported the home was consistently dirty with toys, food and clutter, and that the children were allowed to play outside unsupervised. The providers also reported the children were dirty, had a history of chronic lice and had an odor. The agency held a meeting with all the family's current service providers and initiated further services to the family, including the Family Preservation Program (FPP).

{¶ 4} The complaint further alleged that during the FPP's involvement with the family, concerns were voiced regarding the mother's ability to parent effectively and to provide a safe home environment for the children. FPP closed their case with the family on July 6, 2009

with the same concerns remaining as when it began, as the mother had made little progress. On July 7, 2009, the day before the complaint was filed, the agency received a report of neglect when a service provider visited the home and discovered the children outside and unsupervised while the mother was at a friend's home.

{¶ 5} The children were removed from the home and placed in the custody of the agency. The maternal grandmother and her husband filed a motion for legal custody of the children on October 15, 2009, and an amended motion on January 22, 2010, clarifying that they were only seeking custody in the event that the mother was not reunited with the children.[1]

{¶ 6} On November 9, 2009, the children were adjudicated dependent, based on an agreement and the neglect allegation was withdrawn. On the same day, the agency moved for permanent custody of the children, alleging that the parents could not provide adequate parental care for the children and permanent custody was in the children's best interest.

Permanent Custody Hearing

{¶ 7} A hearing on the permanent custody motion and the grandparents' motion for legal custody began on June 15, 2010 and continued over numerous days until a final hearing date on September 1, 2011. At the hearing, several service providers discussed their involvement with the family.

{¶ 8} A worker from the Butler County Success Program testified that she began working with the family in August 2008 when they came in to enroll the children in school and had problems completing a form. The worker testified that she worked with the mother on removing noncognitive barriers to allow the children to do better in school. She indicated that the program works to remove anything that interferes with a child's ability to learn, and

---

1. For ease of discussion, the maternal grandmother and her husband will be referred to as the grandmother and grandfather, or the grandparents in this decision.

involves access to resources, physicians, and medical appointments. The worker also transported the family to medical appointments and to meetings, scheduled appointments for the children and worked to obtain food for the family.

{¶ 9} A support coordinator for Butler County Board of Developmental Disabilities (BCBDD) testified that she has worked to oversee the needs and coordinate services for the family from March 2009 to present. She indicated that the mother has been diagnosed with mild mental retardation and has diabetes. The support coordinator helped the mother with attending her doctor's appointments and testified that she has been working to arrange for an independent provider to come into the home to work with the mother on nutrition and issues related to her diabetes.

{¶ 10} A worker from the BCBDD's Family Focus program testified that she is a behavior specialist who was assigned to work with the family beginning in January 2009 due to problems the mother was having with aggression and non-compliance from A.L., the youngest child. She indicated that she first did an assessment to determine the motivation for the child's behavior and the needs of the family, and then set goals to decrease the aggression in the home. She indicated A.L.'s behavior was motivated by a need for attention and they worked on ways to give appropriate attention. She worked with the family to establish structure in the home, including providing a planner for mother to keep appointments straight and creating a picture schedule for the child. The worker testified that the mother told her it was hard to remember to write things in the planner and she lost it. Although the worker wrote events on the calendar, the mother failed to use it on her own. The BCBDD worker indicated that she coordinated her efforts with the FPP program and made visual aids to help the family. The worker testified that they created a reward chart with cartoon character stickers to provide positive reinforcement for A.L., but it was never utilized.

{¶ 11} Several workers with Butler County Children Services and FPP also testified at

the hearing. An agency intake caseworker testified it is her job to investigate abuse and neglect. Shortly after the agency received the referral on February 17, 2009, the family intake worker made contact with the family and discussed the allegations, but the mother denied any problems, stating that the children brushed their teeth and bathed every day. The intake worker testified that during her visit, she had concerns regarding the cleanliness of the home. She observed food that had been left out, roaches, moldy dishes, laundry and garbage lying around, and smelled cat urine in the youngest child's room. The intake worker noticed that the children's teeth were very decayed and black in color. She was involved with the family for 30 days and when she became aware that the children had missed several days of school due to lice, the agency provided lice treatments, spray and new bed linens for the family. The intake worker also spoke with the father and explained that the mother did not appear to be able to handle the children and explained that the father needed to be there to help and to protect the children. After working with the family for 30 days, the case was transferred to an ongoing worker.

{¶ 12} An agency caseworker testified that she met the family when the case was transferred to her in March 2009. She indicated that the agency's concerns included parenting, home maintenance, and failure to follow through on medical and dental appointments. She testified that she observed a lack of structure in the home and behavior problems in the youngest child. She also observed "parentified" behavior by the oldest child, as she would answer questions for the mother. At the time, the plan for the family included following through with services that were already in place, including BCBDD, Family Focus, Butler County Success, and Care Case management. The agency also arranged for FPP to work with the family.

{¶ 13} The caseworker testified that the neglect and dependency complaint was filed and the children removed from the home when the family could not successfully complete the

FPP program.  A case plan was prepared for the mother that required a psychological evaluation and for the mother to follow the BCBDD recommendations and the recommendations of the psychologist.  The father was required to undergo a substance abuse evaluation, which he completed.  The agency also referred the grandparents, who were seeking custody of the children, to complete psychological assessments and to follow recommendations.  The caseworker testified that the agency decided to seek permanent custody of the children after the mother's psychological assessment indicated that there were no further services that would be beneficial to her other than those already provided.

{¶ 14} Two FPP workers testified that they worked with the family from March to July 2009 to provide intensive in-home services and parenting education in an effort to prevent removal from the home.  The two FPP workers met with all the service providers involved with the family, then met with the mother and set up goals for the program.  The FPP workers spoke with the father and discussed the need for him to take a more active role in the home.  They testified that the father indicated he was going to make an effort to be more involved, but did not follow through.

{¶ 15} According to the FPP workers, the family's goals involved three areas: general parenting practices, the condition of the home, and the medical needs of the children and mother.  Parenting issues involved discipline, structure, appropriate roles for family members, nutrition, supervision and hygiene for the children.  The workers discussed the various techniques FPP used with the mother, including role play, discussion, question and answer scenarios, visual charts, and clarification.

{¶ 16} The workers indicated that there was no consistent improvement in any of the three areas.  From visit to visit, there was sometimes a bit of improvement, but from the beginning of the program to the end, there was no significant improvement at all.  The FPP workers testified that they typically work with a family one time, but have now worked with this

family three times, with this last time involving two FPP workers intensely working with the family. Although the two previous times FPP worked with the family, it was determined to be successful, the workers indicated they were dealing with wholly different parenting issues due to the current ages of the children.

{¶ 17} At the hearing, several witnesses testified regarding their interaction with the children after the children had been removed from the parents' home. The children's initial foster father testified that the children were placed with him on removal and had just recently moved to a second foster home because the foster father was unable to care for them due to his medical issues. He indicated that when they came into his home, the children did not understand the concept of bathing and brushing their teeth regularly. He explained that he set rules and boundaries for the children and they responded well. He indicated all three children made progress while in his home in their level of cleanliness, general behavior, and school performance.

{¶ 18} A Butler County Children Services Family Resource Specialist testified that she supervised visits between the children and the parents and grandparents at the agency. The parents' visits were scheduled weekly for two hours and the grandparents were permitted to visit every other week along with the parents. The visits were initially started at Level 2, which requires a worker to check in every 15 minutes, but were raised to Level 1 in February 2012, which requires a worker to be in the room at all times to supervise. The BCCS worker indicated that the parents visited regularly, with only a few missed visits due to illness. She testified that the two girls like to tell their mother and father what to do, and the worker would have to tell the children that the parents were in charge and she would have to direct the children's behavior. The worker testified that discipline was inconsistent and the parents looked to her for help in controlling the kids during visits and she would have to provide redirection for the children.

**{¶ 19}** Several witnesses testified regarding the medical and educational needs of the children. The oldest child is on a special educational plan at school due to her attention deficit hyperactivity disorder (ADHD), but is in a regular classroom. She also takes medication for a breathing problem. After removal from his home, the youngest child was moved from a class for developmentally disabled students to a regular classroom and is on an I.E.P. He also takes medication for ADHD. After their removal from the home, all three children were involved in counseling.

**{¶ 20}** The youngest child's therapist testified that she has been working with him since August 2009. She diagnosed ADHD and borderline intelligence. She worked with the child to deal with loss issues from the foster care placement, eliminate the child's lack of control over urination, improve his ability to express and cope emotionally, and improve attention span and decrease impulsivity. The child's urination control issues have improved from 5-7 times a day to less than a couple per week. He is taking medication, and has moved from a special education classroom to a regular class. She indicated that the child needs a caregiver who can not only meet his physical needs, but also his behavioral and emotional needs. She also testified that the child needs a caregiver who can provide positive discipline and effective intervention, and who understands ADHD and can follow through on appointments. The therapist explained that the child further needs a caregiver who understands borderline intelligence functioning and can communicate with the child in a specific and concrete manner. She indicated that the child needs a structured and organized home environment to help reduce the severity of the ADHD and borderline intelligence, and he needs adequate supervision because of his impulsivity.

**{¶ 21}** Several psychological evaluations were admitted into evidence. Dr. Joseph Lipari performed a psychological assessment of the mother on July 31, 2009. Dr. Lipari determined that there are a number of indications that the mother is unable to care for the

children independently. He concluded that reunification cannot be recommended.

{¶ 22} A psychological assessment of the mother was conducted by psychologist Emily Davis on December 10, 2009 to determine the mother's ability to parent and whether any further services were recommended. Davis concluded that she could not recommend that the children be returned to the mother given the concerns regarding the mother's cognitive limitations, her ability to effectively parent, and her inability to provide for the children. The psychologist determined that the mother does appear to be currently receiving adequate services in the community to support her treatment needs and there does not appear to be any additional treatment resources that should be initiated or put into place.

{¶ 23} The maternal grandmother completed a psychological evaluation on January 15, 2010. The evaluator recommended the grandmother receive individual mental health counseling. The grandmother's husband completed an evaluation on the same date and the reviewer recommended anger management treatment.

{¶ 24} At the hearing, several witnesses discussed issues related to the grandparents' motion for legal custody. The agency caseworker testified that the agency did not consider the grandparents to be a viable placement option due to the denial of a home study in 2009, concerns regarding previous history with the agency, and the grandmother's reported involvement with the family prior to the removal without consistent progress being made.

{¶ 25} A home-study worker from BCCS testified that she performed a study on the grandparents in July 2009 to determine if the children could be placed in the grandparents' home. The report states that the grandmother denied having a history with children services, but an extensive history was found spanning 1976-1991. When the worker confronted the grandmother on this statement, the grandmother responded that she thought children's services only went back 10 years for a history. The report reviewed the grandmother's history with the agency, which included abuse involving the grandmother's three children by

the grandmother's ex-husband. The report also discussed concerns that were present in the denial of a 2000 home study. The 2009 home study was denied.

{¶ 26} The home-study worker testified that she was aware that the grandmother's history was 19 to 20 years ago, and that the grandmother's ex-husband was not currently in the home. However, she indicated that the current study was denied based on the agency's concern regarding the grandparents' ability to parent the children. She indicated that there was also concern about the grandmother's ability to protect the children based on a 2000 home study, which was also denied. In particular, the agency was concerned because in the case involving the mother's oldest child, the grandmother allowed the mother to have contact with her oldest daughter three times despite orders prohibiting this contact.

{¶ 27} The BCCS employee who performed the July 2000 home study on the grandparents testified that the study was prepared in order to consider the grandparents as a placement for the parents' oldest son. The home study was denied on the basis of the grandmother's extensive history with children services, the grandparents' failure to report involvement with another granddaughter for whom they were denied placement in 1994, along with concerns in a psychological evaluation, and concerns that the grandmother allowed contact between the mother and her oldest child when under a no-contact order.

{¶ 28} An FPP worker indicated that he was concerned with the grandparents' ability to care for the children because the grandparents transported the children to school and one of the expressed concerns involved the children attending school while dirty and with an unpleasant odor. Concerns were also raised related to the grandmother's ability to provide appropriate support for the mother during the mother's involvement with the FPP program. Additional concerns were raised that the grandparents had allowed the children to be around the maternal aunt who had sexually abused their older half-sibling.

{¶ 29} The mother, father and both grandparents testified at the hearing. The mother

testified that her oldest child, who has a different father, was sexually abused by an aunt who pled guilty to criminal charges for the abuse. This child was placed in the permanent custody of Butler County Children Services in December 1995. Her second child was placed in permanent custody of an agency in Tennessee and was subsequently adopted by a family who retains contact with the mother and father. The mother testified that she receives Social Security disability for "slow learning" and Section 8 housing.

{¶ 30} The mother admitted that prior to the removal of the children, a number of service providers were working with the family, including services from the Butler County Success Program, FPP, and a support coordinator from the BCMRDD. She admitted that one child had three teeth pulled and 11 cavities and that she had to keep the youngest child's medication at school because she could not remember to give it to him. The mother testified that the FPP workers did not communicate well and that she tried, but nothing was good enough for the service providers. She indicated she is attending counseling and has addressed issues related to depression.

{¶ 31} The father testified that he did not have any concerns that the mother would not be able to keep the house clean. He indicated that the children's dental problems were taken care of and disagrees that the house was not clean. He indicated that he intends to be in the house more, including every night and day, if the children are returned.

{¶ 32} The grandmother testified that prior to the children's removal, she lived across the street from the mother and saw the children on a regular basis, if not daily. She testified that she took the children to school and saw the children every morning, but they were never in dirty clothes and their teeth were brushed. She admitted the children had dental problems, but testified that the children had dental appointments that had to be cancelled because the children took ill. She indicated that she did not step in and help with the children more because she wanted to give the mother a chance to take responsibility for the children.

{¶ 33} The grandmother discussed her previous involvement with Children Services and admitted that her own children were removed and placed in foster care at one point. She denied the cleanliness issues discussed in the older home studies, but admitted that the children suffered physical abuse by her ex-husband. The grandmother testified that when asked whether she had prior involvement with children services, she only thought that the agency wanted to know if there had been any involvement for the past 10 years. She admitted that she had requested placement of the children's half-sibling who had been sexually abused by an aunt. The grandmother testified that she allowed the mother to visit with this child during visitations in her home, even though the court had issued a no-contact order.

{¶ 34} The grandfather testified that before the children were removed, he saw them almost every day. He indicated one or two of the children had black teeth and the other's teeth were stained, and that he and the grandmother tried to address the problem. He stated that they made dental appointments, but the children became sick. He testified that he went to anger management classes and found them beneficial. He discussed an incident involving a confrontation with a caseworker, discussed earlier at the hearing, and indicated that he did not realize the seriousness of his actions until taking anger management classes. He indicated that the only time the children saw the aunt who had abused their half-sister was when the family picked the aunt up for church services and that the children were never left alone with the aunt. He testified that he thought the mother was taking good care of the children and is doing much better now after dealing with her depression.

{¶ 35} The adoptive mother of the children's older full-sibling testified that she first acted as the foster parent for the child 11 and one-half years ago, when he was removed at the age of two months from the parents' home in Tennessee. She testified the child has special needs, including ADHD and cognitive delays. She testified that she has adopted the

child and he is doing well. The adoptive mother indicated that she has maintained contact between the child and his biological parents. She allows the child to phone approximately every other week and to visit around two times a year. The foster mother stated that she has had interaction over the years with the three children in this case when her son visits with his biological parents and family. The adoptive mother indicated she has a close relationship with the children, who have visited her home three times in Tennessee. She testified that she has visited the children three or four times since they were placed in foster care and noticed that they are more behaved, content and clean.

{¶ 36} The adoptive mother testified that she would like to adopt the three children in this case if permanent custody is granted. She stated that she has room for the children and has completed an interstate home study, which has been approved. She indicated if the children were adopted, she would maintain the same relationship with the biological parents that she has with their other child.

{¶ 37} The guardian ad litem submitted a report documenting her involvement in the case. The guardian recommended that the grandparents' motion for legal custody be denied and that the court grant permanent custody to the agency. The guardian ad litem was cross-examined regarding her report and recommendations. She indicated that the children's desires regarding where they would like to live were "all over the place," but they most consistently indicated they would like to live with the mother. The guardian testified that her concerns regarding the father's ability to provide the children with the necessary care involved the fact that the father was living in the home prior to the removal, but did not clean the house, did not do laundry, or address issues with the animals in the home. She did not see any evidence that the father contributed positively to the living conditions. She indicated the father only attended the FPP sessions a few times and nothing prohibited him from participating more and being more involved.

{¶ 38} After the conclusion of the hearing, the magistrate conducted in camera interviews with each of the children individually. The magistrate issued a decision granting permanent custody to the agency on December 29, 2011. Objections to the decision were overruled by the trial court on June 26, 2012. The mother, father and children have each separately appealed the trial court's decision.

Permanent Custody and Appellate Review Standards

{¶ 39} Before a natural parent's constitutionally protected liberty interest in the care and custody of her child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *Santosky v. Kramer*, 455 U.S. 745, 759, 102 S.Ct. 1388 (1982).

{¶ 40} Pursuant to R.C. 2151.414(B)(1), a court may terminate parental rights and award permanent custody to a children services agency if it makes findings pursuant to a two-part test. First, the court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors of R.C. 2151.414(D). Second, the court must find that any of the following apply: the child is abandoned; the child is orphaned; the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; or where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. R.C. 2151.414(B)(1)(a), (b), (c) and (d); *In re E.B.*, 12th Dist. Nos. CA2009-10-139, CA2009-11-146, 2010-Ohio-1122, ¶ 22.

{¶ 41} The juvenile court found, by clear and convincing evidence, that granting permanent custody of the children to the agency was in the children's best interest and that the children cannot be placed with either of the parents within a reasonable time.

{¶ 42} An appellate court's review of a juvenile court's decision granting permanent custody is limited to whether sufficient credible evidence exists to support the juvenile court's

determination. *In re Starkey*, 150 Ohio App.3d 612, 2002-Ohio-6892, ¶ 16 (7th Dist.). As an appellate court reviewing a decision granting permanent custody, we neither weigh the evidence nor assess the credibility of the witnesses, but instead determine whether there is sufficient clear and convincing evidence to support the juvenile court's decision. *In re S.F.T.*, 12th Dist. Nos. CA2010-02-043, CA2010-02-044, CA2010-02-045, CA2010-02-046, 2010-Ohio-3706. "It is well-established that the juvenile court had the opportunity 'to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.'" *In re C.B.*, 12th Dist. Nos. CA2008-01-002, CA2008-01-003, 2008-Ohio-5543, ¶ 18, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).

Children's Appeal

**{¶ 43}** The attorney for the children appeals the trial court's decision to grant permanent custody to the agency and argues that the court should have granted the grandparents' motion for legal custody. The children raise three assignments of error involving the trial court's decision that it was in the best interest of the children to grant permanent custody and to deny the grandparents' motion for legal custody.

**{¶ 44}** In its decision, the court first analyzed the factors for determining the best interest of a child in a permanent custody hearing. These factors, found in R.C. 2151.414(D)(1), provide that in considering the best interest of a child in a permanent custody hearing:

> [T]he court shall consider all relevant factors, including, but not limited to the following:
>
> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or

through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child."

{¶ 45} With regard to R.C. 2151.414(D)(1), the court found that the children have remained in foster care since they were removed from their home on July 8, 2009 and that they are currently in their second foster home. The court indicated that the children are doing well in foster care and the negative behaviors exhibited by the children while in the mother's home have abated since placement in foster care. The court further found that the father's relationship and involvement with the children prior to removal was limited and inconsistent. The court found the evidence showed that the father was out of town frequently for work and that at various times in the case, the mother indicated to others that the father was not living in the home.

{¶ 46} The court also found that it appeared the mother was the primary parent and caregiver for the children and was overwhelmed trying to maintain a home, manage three children with health and behavior issues, and manage her own physical, cognitive and mental health issues. The court found that the grandparents lived in close proximity to the children and had frequent contact with the mother and children prior to removal. The court also reviewed the testimony regarding the parents' and grandparents' visitations at the agency with the children.

{¶ 47} In considering R.C. 2151.414(D)(2), the court indicated that it held an in camera

interview with each of the children separately and determined each child's wishes and concerns regarding custody. The court indicated that these desires and concerns were taken into account in making a decision. In considering this factor, the court also found that the guardian ad litem had recommended that permanent custody of the children be awarded to the agency.

{¶ 48} In considering the custodial history of the children under R.C. 2151.414(D)(1)(c), the court found that the children entered into agency custody on July 8, 2009 and have remained in foster care since that time.

{¶ 49} The court further found, pursuant to R.C. 2151.414(D)(1)(d), that the children are in need of a legally secure placement. The magistrate noted in its decision that as of the date of the decision, the children had been in foster care for a period of about 29 months. The court further considered whether the children could be placed with mother, father or grandparents and reviewed the history of the case and the involvement of the parties. With regard to the grandparents, the court found that the grandmother has a "very troubling and lengthy history with the agency, going back to 1976."

{¶ 50} The court reviewed the history, which included the grandmother's history with children services, involving physical and sexual abuse of her own children, failure to comply with court orders, and serious housekeeping and hygiene issues. The court noted that home studies on the grandparents were denied in July 2000 and September 2009. The court acknowledged that much of the grandmother's history involved her relationship with her previous husband which ended years ago. However, the court found that this history was relevant now as an example of the choices made by the grandmother when dealing with the safety of her own children and an indicator of choices she may make in the future if the grandchildren were placed in her custody.

{¶ 51} The court also found the grandparents' more recent history in this case

- 17 -

troubling. The court noted that both grandparents testified that they were in regular contact with the children, both in the mother's home and in their own home, prior to the placement of the children in foster care. The court found that either the grandparents were unable to see the conditions of the mother's home and the children's hygiene issues, or they chose not to take sufficient action to remedy those conditions. The court concluded that in order to grant legal custody to the grandparents, it would require the court to overlook the long history of the family with the agency and the lack of involvement of the grandparents in the lives of the children to prevent or remedy the conditions which resulted in the children's removal.

{¶ 52} The court considered these factors and concluded that mother and father, and the grandmother, all have a long history with children's services. The court found the father has not demonstrated the ability to live either independently or with the mother and maintain a stable home and meet the needs of the children. Based on a review of the factors, the court found that it was in the best interest of the children to grant permanent custody to the agency.

{¶ 53} In regard to the grandparents' motion for custody of the children, the court also indicated that it had considered the factors set forth in R.C. 3109.04(F) and found that based on a review of those factors, along with the factors above, the grandparents' motion for legal custody was not well-taken and it was not in the children's best interest to be placed with the grandparents.

{¶ 54} As an initial note, the children's third assignment of error involves an argument that the court erred because it failed to consider the best interest factors in R.C. 3109.04(F) separately from the best interest factors in R.C. 2151.414(D). However, this court has determined that when determining legal custody pursuant to an action involving an abused, neglected or dependent child, the paramount concern is the best interest of the child and the court should consider the totality of the circumstances affecting the best interest of the child.

- 18 -

*In re M.A.*, 12th Dist. No. CA2011-02-030, 2012-Ohio-545, ¶ 16. This court further held that "although there is no statutory mandate that the factors in R.C. 3109.04(F) be expressly considered and balanced before fashioning an award of custody under R.C. 2151.353(A)(3), a juvenile court is certainly entitled to consider those factors, as well as any other relevant factors, in making its custody determination." *Id.* Therefore, the court properly considered the best interest factors in making its determination regarding the grandparents' motion for legal custody and was not required to separately analyze the R.C. 3109.04(F) factors.

{¶ 55} In their remaining two assignments of error, the children present arguments related to the court's best interest finding. First, they argue that the court placed excessive weight on the grandmother's distant history and ignored the life choices she subsequently made. Secondly, the children argue the court erred in concluding that the grandparents shared responsibility for the condition of the children and the mother's home prior to the children's removal.

{¶ 56} We begin by noting that it is well-established that relatives seeking custody of a child are not afforded the same presumptive rights that a natural parent receives. *In re A.C.*, 12th Dist. No. CA2006-12-105, 2007-Ohio-3350. Instead, the inquiry focuses on what is in the best interest of the child. *Id.* A juvenile court is not required to find by clear and convincing evidence that a relative is an unsuitable placement option. *In re M.W.*, 12th Dist. No. CA2011-07-052, 2011-Ohio-6794, ¶ 31.

{¶ 57} A reviewing court will not reverse a juvenile court's custody decision absent an abuse of discretion. *In re A.C.* at ¶ 15. The discretion granted to a juvenile court in custody matters "should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. *Id.* The knowledge a trial court gains through observing the witnesses and the parties in a custody

proceeding cannot be conveyed to a reviewing court by a printed record." *In re A.W.-G.*, 12th Dist. No. CA2003-04-099, 2004-Ohio-2298, quoting *Miller v. Miller* (1988), 37 Ohio St.3d 71, 74. Thus, an appellate court affords deference to a judge or magistrate's findings regarding witnesses' credibility. *In re D.R.*, 12th Dist. Nos. CA2005-06-150 and CA2005-06-151, 2006-Ohio-340, ¶ 12.

{¶ 58} The children argue that the court failed to acknowledge the significant improvements the grandmother made and that her history with children services was many years ago. They also argue that the court failed to analyze the grandmother's history in proper context.

{¶ 59} On review of the evidence in this case and the trial court's decision, we find no error in the court's consideration of the grandmother's history of involvement with children's services. A relative's past history is a relevant factor for a court to consider when determining whether it is in a child's best interest to grant custody to the relative. *See, e.g., In re E.M.D.R.E.*, 12th Dist. Nos. CA2009-08-220, CA2009-09-222, 2010-Ohio-925; *In re R.E.P.*, 5th Dist. No. 2011AP050021, 2011-Ohio-5375.

{¶ 60} The court considered the evidence related to the grandmother's interaction with the agency, but also acknowledged that much of this history involved the grandmother's relationship with her ex-husband which ended years ago. The court found, however, this history relevant as examples of choices the grandmother made when dealing with her own children.

{¶ 61} In addition, the court heard evidence that after the grandmother's relationship with her ex-husband ended, the grandmother violated a no-contact order and had also allowed the children to be around the aunt responsible for sexually abusing their half-sibling. Additional evidence was presented regarding the grandmother's inability to provide a proper

support system for the mother as part of the FPP program.  The court considered all of the grandmother's history as evidence of her parenting in the past and her ability to care for and protect the children, but also considered more recent evidence involving the grandparents. The court properly considered all of this evidence in context, including the age of the children services history and the improvements made by the grandmother, along with recent events impacting the grandparents' ability to care for and protect the children

{¶ 62}  Finally, as mentioned above, the court concluded that the grandparents had "at least some responsibility" for the conditions in the mother's home and the condition of the children prior to their removal.  Although the court used wording regarding the grandparents' "responsibility" in the conditions of the home, when read in context of the decision and evidence in the case, we find no error in the court's consideration of the grandparents' actions or inaction with regard to the children.

{¶ 63}  While the grandparents were not in loco parentis to the children and did not have legal responsibility for the care of the children, their action or inaction regarding basic hygiene and dental issues, along with the condition of the mother's home, are an indicator of the ability of the grandparents to care for and recognize the needs of the children.  Both grandparents testified that they saw the children regularly and helped with their care on a regular basis, while service providers discussed the condition of the children's hygiene and dental issues.  The grandparents either minimized these issues, said they were being dealt with, or indicated they wanted to give mother an opportunity to parent on her own.  These issues reflect on the grandparents' ability to care for and protect the children, whether or not they had a legal responsibility to do so.

{¶ 64}  After a review of the trial court's decision and the record, we find that the trial court appropriately considered these issues and did not place undue emphasis on the grandmother's past history or place undue responsibility on the grandparents to care for the

children before removal. The children's assignments of error are overruled.

Father's Appeal

{¶ 65} In his sole assignment of error, the father argues that the trial court's decision was against the manifest weight of the evidence. Specifically, he argues that the trial court's finding that the children could not be placed with either parent within a reasonable time was in error. He argues that there was very little information at the hearing regarding the father, that he complied with his case plan services and his interaction with the children was appropriate. The father contends that there was no discussion regarding what steps he needed to take to allow him to obtain custody and instead the emphasis was on how he should be assisting the mother.

{¶ 66} As discussed above, in addition to finding that granting permanent custody was in the children's best interest, the trial court found that the children could not be placed with either parent within a reasonable time. R.C. 2151.414(E) provides that the court shall consider all relevant evidence in determining whether a child can be placed with its parents within a reasonable time. This section also provides that if a court determines by clear and convincing evidence that any of several findings exist, the court shall make a finding that the children cannot be placed with the parents. R.C. 2151.414(E)(1)-(16). As related to the father, the court found that several of these sections applied in considering whether the children could be placed with their parents within a reasonable time.[2]

{¶ 67} The court first considered R.C. 2151.414(E)(1), which provides:

> Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have

---

2. The court also considered R.C. 2151.414(E)(2) as it related to the cognitive limitations of the mother.

substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

**{¶ 68}** The court reviewed the testimony presented by the various service providers and the parents' failure to remedy the conditions that led to the children's removal. With regard to the father, the court found that father participated in 9 of the 37 FPP sessions, but the conditions of the home were not significantly improved over the course of the program. The court found the mother and father utilized services and resources, but the participation did not result in significant change.

**{¶ 69}** The court also found that R.C. 2151.414(E)(4) applied. Under this section, the court must consider whether "[t]he parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child."

**{¶ 70}** The court found that the father provided financial assistance to the family only if the mother's resources were insufficient at the time. The court further found that the father was out of the home frequently, either living with his boss or out of town for work. The court stated that the father failed to demonstrate an ability to independently provide stable income or housing for the children. The court further found that the father has not demonstrated comprehension of the parenting skills taught by FPP and he has never parented the children on his own.

**{¶ 71}** Finally, the court considered 2151.414(E)(16), which provides that the court should consider any other relevant factor. Under this section, the court considered the fact that the father had his parental rights to an older child terminated in Tennessee. The court

indicated that although the record did not indicate if this termination was voluntary or involuntary, the termination was relevant to provide a historical perspective to the parents' ability to effectively parent the children. Based on consideration of these factors, the court made a finding that the children could not be placed with either parent within a reasonable time or should not be placed with their parents.

{¶ 72} Father's argument on appeal focuses on the lack of evidence that he was unable to parent effectively and the lack of discussion regarding the steps the father would need to take to obtain custody. However, any lack of evidence is based on the father's failure to become more involved in the children's lives and to take an active role in the home. Nothing in the record indicates that the father desired to parent the children on his own, or that he ever discussed this as an option. Instead, the focus of the service providers was an effort to try to increase the father's involvement in the home.

{¶ 73} The evidence indicates although the father expressed a willingness to help out more and to have greater involvement in the home, he failed to do so. The evidence in the record indicates the father was not regularly in the home, did not have independent housing, and failed to provide regular financial support for the children. Given the father's inability to become more involved and provide support for the mother, we find no error in the court's decision that the children could not be placed with the father within a reasonable time. The father's assignment of error is overruled.

Mother's Appeal

{¶ 74} Counsel for the mother has filed a brief with this court pursuant to *Anders v. California* (1967), 386 U.S. 738, 87 S.Ct. 1396, which: (1) indicates that a careful review of the record from the proceedings below fails to disclose any errors by the trial court prejudicial to the rights of mother upon which an assignment of error may be predicated; (2) lists one potential error "that might arguably support the appeal," *Anders*, at 744, 87 S.Ct. at 1400; (3)

requests that this court review the record independently to determine whether the proceedings are free from prejudicial error and without infringement of mother's constitutional rights; (4) requests permission to withdraw as counsel for mother on the basis that the appeal is wholly frivolous; and (5) certifies that a copy of both the brief and motion to withdraw have been served upon mother.

{¶ 75} Having allowed mother sufficient time to respond, and no response having been received, we have accordingly examined the record and find no error prejudicial to mother's rights in the proceedings in the trial court. Therefore, the motion of counsel for mother requesting to withdraw as counsel is granted, and the mother's appeal is hereby dismissed for the reason that it is wholly frivolous.

### Conclusion

{¶ 76} The assignments of error raised by the children and the father are overruled and the trial court's decision granting permanent custody to the agency is affirmed. The mother's appeal is dismissed and her counsel's request to withdraw is granted.

HENDRICKSON, P.J. and PIPER, J., concur.