[Cite as *In re: K.S.*, 2019-Ohio-2384.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

|  |  |  |
|---|---|---|
| IN RE: | : | |
| K.S. | : | CASE NO. CA2019-01-009<br>CA2019-02-015 |
| | : | |
| | | O P I N I O N<br>6/17/2019 |
| | : | |

APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 17-D000187

David P. Fornshell, Warren County Prosecuting Attorney, Kristen A. Brandt, 520 Justice Drive, Lebanon, Ohio 45036, for appellee

Caparella-Kraemer & Associates, LLC, Bradley M. Kraemer, 4841-A Rialto Road, West Chester, Ohio 45069, for appellant paternal grandfather

A. Aaron Aldridge, 130 East Mulberry Street, Lebanon, Ohio 45036, for appellant mother

Sean Brinkman, 10 West Monument Avenue, Dayton, Ohio 45402, guardian ad litem

**HENDRICKSON, P.J.**

{¶ 1} Appellants, the biological mother ("Mother") and paternal grandfather ("Paternal Grandfather") of K.S., appeal from the decision of the Warren County Court of Common Pleas, Juvenile Division, granting permanent custody of K.S. to appellee, Warren County Children Services ("WCCS" or "the Agency"), and denying Paternal Grandfather's motion for legal custody.

{¶ 2}   K.S. was born on November 29, 2015 to Mother, a minor, and to Father, who is not a party to the present appeal.  When K.S. was born, Father was in jail awaiting trial on charges related to his relationship with Mother.  Mother was living with her father and was on probation with the Warren County Juvenile Court for drug-related issues.  As part of her probation, Mother was randomly drug screened, and she tested positive for marijuana, benzodiazepines, MDMA, and cocaine.  WCCS instituted a safety plan and administered drug screens to the safety plan participants, which included Mother, Mother's father, and Mother's new boyfriend.  Mother and her boyfriend tested positive for Xanax and marijuana and Mother's father tested positive for marijuana, methamphetamines, and amphetamines.

{¶ 3}   On October 25, 2017, WCCS filed a complaint alleging K.S. was a neglected and dependent child.  On that same date, the juvenile court held an emergency shelter care hearing and K.S. was placed in the emergency shelter care of the Agency.  Mother, who was still a minor at this time, was also placed in the Agency's custody.

{¶ 4}   On January 3, 2018, an adjudicatory hearing in K.S.'s case was held.  At this time, Mother and Father stipulated that Father was currently incarcerated due to offenses involving Mother and that Mother and her father had tested positive for illegal drugs.  The juvenile court adjudicated K.S. a dependent and neglected child.  Subsequently, on January 18, 2018, the juvenile court issued a dispositional decision ordering K.S. be placed in the temporary custody of the Agency.

{¶ 5}   A guardian ad litem ("GAL") was appointed for K.S. and a case plan was established for Mother.  The case plan required Mother to cooperate and make herself available to the Agency, to submit to random drug screens, complete a mental health assessment and follow all recommendations, complete a drug and alcohol assessment and follow all recommendations, refrain from criminal activity, comply with the terms of her

probation, complete parenting classes, and maintain a source of income so as to provide K.S. with food, housing, and other basic needs. Mother and K.S. were briefly placed in an independent living facility together. K.S. was subsequently removed and placed in a foster-to-adopt home, and Mother was granted weekly visitation with the child.

{¶ 6} On October 24, 2018, the Agency filed a motion for permanent custody of K.S., contending that Mother and Father had not made sufficient case plan progress, that K.S. could not be placed with either of his parents within a reasonable time or should not be placed with his parents, and that vesting permanent custody to WCCS was in K.S.'s best interest. A hearing on the Agency's motion was scheduled for January 7, 2019. Prior to the hearing, the GAL filed a report recommending that permanent custody be granted to the Agency.

{¶ 7} On January 7, 2019, the day of the permanent custody hearing, Paternal Grandfather filed a motion for legal custody of K.S and a statement of understanding, as required by R.C. 2151.353(A)(3). Paternal Grandfather was represented by the same counsel who represented Father. Counsel requested a continuance of the permanent custody hearing on the basis of Paternal Grandfather's motion for legal custody. Counsel acknowledged the "final hour" filing of the motion and indicated it was filed so late because Father and Paternal Grandfather had believed Mother was going to be able to resume her custodial obligations. According to counsel, "as soon as [Father] * * * became aware that [M]other was not likely to * * * be able to resume her responsibilities in a timely manner, [P]aternal [G]randfather then agreed to file a motion, and * * * wished to assume responsibilities as custodian."

{¶ 8} The juvenile court indicated it was treating Paternal Grandfather's motion as a request to intervene in the case, as well as a request for legal custody of K.S. The court

- 3 -

called Paternal Grandfather to the stand and questioned him about his relationships with K.S., Mother, and Father. Paternal Grandfather advised the court that Father had been arrested and incarcerated in federal prison as a result of his relationship with Mother. Although Paternal Grandfather believed he was not permitted to have contact with Mother or K.S. as a result of Father's criminal case, he nonetheless communicated with Mother. However, Paternal Grandfather had never met or spoken with K.S. Paternal Grandfather had traveled from his home in Wisconsin to Ohio around the time of K.S.'s first birthday to try to see the child, but Paternal Grandfather's efforts were ultimately unsuccessful.

{¶ 9} Paternal Grandfather first claimed that he did not know the Agency had removed K.S. from Mother's care until "six or nine months ago," around April or July of 2018. However, Paternal Grandfather later admitted that he knew about the Agency's involvement "back in October of 2017" because Mother had contacted him and informed him that K.S. was in foster care. Paternal Grandfather testified he did not initially seek to get involved in the case because he thought Mother "was doing what she was supposed to be doing, and she was supposed to be getting [K.S.] back." However, after he spoke with Mother "probably * * * three months ago," or around October 2018, and learned that Mother had been arrested and was in jail, Paternal Grandfather decided to file his motion for legal custody.

{¶ 10} The Agency opposed Paternal Grandfather's motion to intervene and motion for legal custody. The Agency noted that although Paternal Grandfather had been aware of the Agency's custody of K.S. for well over a year, Paternal Grandfather had not contacted WCCS to request that he be considered for placement of the child, nor had he attempted to set up visitation or contact with K.S. The juvenile court orally denied Paternal Grandfather's request to intervene and motion for legal custody. The court then heard testimony relating to the Agency's motion for permanent custody from K.S.'s caseworker, Mother, Father, and

Paternal Grandfather.[1]

{¶ 11} K.S.'s caseworker explained that the Agency had been involved with Mother's family since 2014 as a result of drug use by Mother and Mother's father. When K.S. was born in November 2015, Mother was living with her father and was on probation with the juvenile court as a result of drug-related activities. Mother tested positive for marijuana, benzodiazepines, MDMA, and cocaine when tested by probation. She was given an additional drug test by the Agency and tested positive for marijuana and Xanax. As a result, on October 25, 2017, K.S. was removed from Mother's care and placed in the Agency's custody.

{¶ 12} The caseworker explained that because Mother was also a minor, she was also removed from her father's care and placed in the Agency's custody. K.S. and Mother briefly lived together in an independent living facility. However, after the Agency realized K.S. needed a higher level of supervision, K.S. was placed in a foster-to-adopt home. According to the caseworker, K.S. has been in the same foster home for over a year and he has made "tremendous progress" in his foster home. The caseworker testified that when K.S. was originally removed from Mother's care, K.S. was developmentally behind, did not make eye contact with anyone, did not respond to anyone, and was noncommunicative. K.S. underwent physical, occupational, and speech therapy and received services from Head Start and Help Me Grow. K.S. progressed and can now carry on conversations, say full sentences, and knows people's names and his colors. K.S. and his foster family have bonded with one another and the foster family has expressed an interest in adopting K.S. The caseworker testified she believes it is in K.S.'s best interest for permanent custody to be granted to WCCS.

---

1. Mother and Father, who were both incarcerated at the time of the permanent custody hearing, appeared by

{¶ 13} The caseworker discussed Mother's case plan progress, noting that the only case plan requirement Mother had completed was taking parenting classes. In April 2018, Mother participated in a drug and alcohol assessment and it was recommended that she engage in drug and alcohol treatment, maintain long-term sobriety, and use coping skills to assist in maintaining her sobriety. Mother underwent treatment and was sober for a period of time. However, in September 2018, Mother tested positive for methamphetamine, THC, and cocaine. Based on the positive test, Mother was asked to reengage in drug and alcohol treatment. The caseworker referred Mother to Recovery Define, but before Mother could complete an assessment, Mother was arrested in Florida for drug offenses relating to the possession of methamphetamine and marijuana. Mother was to remain jailed in Florida until May 2019.

{¶ 14} The caseworker testified Mother had not completed the mental health assessment set forth in her case plan. The Agency had requested a mental health assessment due to Mother's upbringing, her drug issues, her abusive relationship with Father, and the fact that she had a child at such a young age.

{¶ 15} The caseworker also testified that Mother had not maintained stable housing or a stable income after reaching the age of majority. While Mother was in the Agency's custody, she had stable housing. The caseworker discussed with Mother the option of Mother remaining in the Agency's custody beyond her eighteenth birthday to make it easier for Mother to complete her case plan requirements. The caseworker explained that if Mother had elected to stay in the Agency's custody, Mother would have been placed in her own apartment where she would have been responsible for her own bills, but would have received transportation assistance from the Agency. Mother insisted, however, that she wanted to

telephone and were represented by separate counsel.

leave the Agency's custody and learn how to do things on her own. After Mother turned 18 years old in August 2018, she left the Agency's custody and returned to her father's home – the same home she and K.S. had been living in when the Agency became involved in October 2017.

{¶ 16} After Mother left the Agency's custody, the caseworker discussed possible housing options with Mother. The caseworker explained to Mother that the Bridges Program could help Mother obtain housing. The caseworker knew that Mother had made initial contact with Bridges, but the caseworker did not have any additional information about the result of that contact. The caseworker also did not know if Mother had contacted any other housing providers before she was arrested and jailed in Florida.

{¶ 17} The caseworker testified about Mother's visitations with K.S., explaining that when Mother first exercised her visitation, K.S. was "very standoffish." However, K.S.'s bond with Mother improved as the visits continued. The caseworker testified Mother was "normally very good" with K.S. but did not always provide structure to K.S. during visits. When that issue was brought to Mother's attention, Mother stated that she was reluctant to discipline K.S. because she had limited time with her child and wanted to "be able to enjoy" the visits.

{¶ 18} When Mother was in the Agency's custody, she consistently attended visitations with K.S. However, once she left the Agency's custody, Mother arrived late or missed visitations altogether. Mother was required to confirm by 8:00 a.m. on the morning of each visit whether or not she would attend that day. Mother abided by this requirement only once or twice. Eventually, Mother was required to arrive at the visitation center an hour before her visits would begin to ensure her presence before K.S. was brought to the center. Mother also did not abide by this condition. Mother's last visit with K.S. occurred on September 26, 2018. Mother had gone more than 90 days without any communication with K.S. by the time of the

permanent custody hearing.

{¶ 19} The caseworker testified that Father was not a placement option for K.S. as he was serving a lengthy prison sentence in a federal penitentiary in Arizona for offenses committed against Mother when she was a minor. Father had been convicted of coercion and enticement of a minor and was not scheduled to be released from prison until 2027. Due to Father's lengthy incarceration, he did not have an active case plan with the Agency and the caseworker had not personally contacted Father regarding K.S. or any possible relative placements for K.S.

{¶ 20} When questioned about the Agency's communication with Paternal Grandfather, the caseworker stated that the Agency had not had any contact with him. The caseworker indicated that neither Mother nor Father had identified Paternal Grandfather as a potential placement for K.S. According to the caseworker, the Agency "ha[d] to be given his name by either parent * * * or the parents [had to] sign a release for me to be able to call [him], because otherwise I can't confirm or deny there's an open case." The caseworker noted that Mother had Paternal Grandfather's contact information but "didn't want to give it to [the Agency] because she * * * didn't want [K.S.] to be in anybody else's care." In order for Paternal Grandfather to be evaluated for placement, Paternal Grandfather's home state of Wisconsin would need to do a background check, fingerprinting, and a home study. The caseworker estimated the process would take somewhere between six months to a year.

{¶ 21} Mother testified K.S. has not been in her custody since October 25, 2017, and she has not visited with K.S. since September 26, 2018. Mother agreed that she had not completed all the case plan requirements for reunification but stated she had made more progress than the caseworker indicated. In addition to completing parenting classes, Mother claimed to have completed a mental health assessment at the same time she completed her

initial drug and alcohol assessment. Mother claimed she had not originally appreciated "how serious the situation was, and * * didn't think [she] needed involvement in mental health [treatment]." However, after talking to the caseworker, Mother decided she was willing to undergo treatment at Recovery Define. However, Mother was arrested in Florida before she could start such treatment.

{¶ 22} Mother further admitted that after completing drug and alcohol treatment in April 2018, she relapsed in September 2018. Mother stated she intended to reengage in treatment through Recovery Define and had completed a second drug and alcohol assessment, where it was recommended that she engage in an intensive outpatient program. However, before she could undergo such treatment, she was arrested on drug offenses in Florida. Mother testified that she intended to start alcohol and drug courses and anger management courses in jail in February 2019.

{¶ 23} Mother acknowledged that after turning 18 years-old, she decided to leave the Agency's custody and move back in with her father. However, Mother stated she had been pursuing an alternative living arrangement. Before she was arrested, Mother had contacted the Bridges Program and filled out applications for Metropolitan and Section 8 housing.

{¶ 24} Mother testified she held various jobs during the pendency of the case but was unable to retain the jobs due to transportation issues. Mother explained that she was not permitted to obtain her license while in the Agency's custody and had yet to obtain her license after leaving the Agency's custody. Mother stated her transportation issues were the primary reason she missed or was tardy for visitations with K.S.

{¶ 25} Finally, Mother testified she has had contact with Paternal Grandfather since K.S.'s birth, but Paternal Grandfather has never met K.S. Mother indicated she "would be in agreement" with Paternal Grandfather becoming K.S.'s legal custodian.

{¶ 26} Father testified he has been in prison for the duration of K.S.'s life, has never seen or had contact with the child, and has not paid any child support for K.S. Father has known about the Agency's involvement since K.S. was removed from Mother's custody in October 2017. Father testified it was his hope that K.S. would be placed in Paternal Grandfather's custody until either he or Mother have the ability to care for K.S.

{¶ 27} Paternal Grandfather was called as a witness by Father. He testified that in October 2017, he learned from Mother that the Agency had removed K.S. from her custody and placed him in foster care. Paternal Grandfather was not informed of the juvenile court case by the Agency and was never contacted by the Agency to see if he was a viable placement for K.S. Paternal Grandfather stated that on one occasion he contacted WCCS to obtain information about K.S.'s case but was informed by the Agency that it could not provide him with information at that time. Paternal Grandfather's knowledge of the case proceedings, therefore, came from what he was told by Mother and Father. Paternal Grandfather acknowledged that prior to the date of the permanent custody hearing, he did not file a motion with the juvenile court asking to become involved in K.S.'s case. Rather, Grandfather indicated he relied on Mother's representations that "everything was going fine * * * and she would get [K.S.] back."

{¶ 28} Paternal Grandfather admitted he has never seen or communicated with K.S. Nonetheless, Paternal Grandfather stated he was willing and able to take custody of K.S. and had the financial means to care for the child.

{¶ 29} After considering the foregoing testimony, the juvenile court issued a decision granting the Agency's motion for permanent custody and denying Paternal Grandfather's motion for legal custody. The court found by clear and convincing evidence that K.S. had been abandoned by Father and that K.S. could not be placed with either Mother or Father

within a reasonable time or should not be placed in either parents' care as they demonstrated a lack of commitment by failing to regularly support, visit, or communicate with K.S. when able to do so and were unwilling to provide food, clothing, shelter, and other basic necessities for K.S. Moreover, with respect to Mother, the court found that "notwithstanding reasonable case planning and diligent efforts by the Agency, Mother ha[d] failed continuously and repeatedly to substantially remedy the conditions causing the Child to be placed outside the Child's home." The juvenile court found that K.S.'s "need for legally secure placement [could not] be achieved without a grant of permanent custody to WCCS." Therefore, after considering the best interest factors set forth in R.C. 2151.414(D)(1)(a)-(e), the court determined it was in K.S.'s best interest for permanent custody to be granted to the Agency.

{¶ 30} In denying Paternal Grandfather's motion for legal custody, the court indicated it took into consideration "the best interest of the minor child." The court further stated that

> [p]ursuant to *In re Schmidt*, 25 Ohio St.3d 331, 496 N.E. 2d 952 (1986), the Court finds that Paternal Grandfather does not have a legally protected right of association with the child. Further, the Court finds that there were no allegations or evidence presented that would reasonably indicate that Paternal Grandfather had a right to custody of, or visitation with, the minor child. He never obtained, through statute, court order, or other means, any legal right to custody or visitation with the minor child. Similarly, he had no legal interest in the care and custody of the minor child which would have allowed him to intervene as of right pursuant to Civ.R. 24.

{¶ 31} Mother and Paternal Grandfather separately appealed the juvenile court's decision.

## Paternal Grandfather's Appeal

{¶ 32} Assignment of Error No. 1:

{¶ 33} THE TRIAL COURT ERRED IN DENYING [PATERNAL] GRANDFATHER'S MOTION FOR LEGAL CUSTODY.

{¶ 34} In his sole assignment of error, Paternal Grandfather argues the juvenile court erred when it denied his motion for legal custody as the evidence presented at the January 7, 2019 hearing demonstrated it was in K.S.'s best interest to be placed in his custody. Paternal Grandfather further contends the court's decision to deny his motion for legal custody was against the manifest weight of the evidence.

{¶ 35} After a child is adjudicated abused, neglected, or dependent, the court may award legal custody of the child to a nonparent who, like Paternal Grandfather, has filed a motion requesting legal custody and a statement of understanding. R.C. 2151.353(A)(3). "Legal custody vests in the custodian the physical care and control of the child while residual parental rights and responsibilities remain intact," and "[u]nlike permanent custody, granting legal custody does not terminate the parent-child relationship." *In re M.M.*, 12th Dist. Fayette No. CA2010-12-034, 2011-Ohio-3913, ¶ 7.

{¶ 36} "[R]elatives seeking custody of a child are not afforded the same presumptive rights that a natural parent receives." *In re A.B.*, 12th Dist. Clermont No. CA2013-03-024, 2013-Ohio-3405, ¶ 34. A juvenile court is not required to find by clear and convincing evidence that a relative is an unsuitable placement option; rather, when a grandparent seeks legal custody, the inquiry focuses on what is in the best interest of the child. *Id.* at ¶ 34. "A juvenile court 'may award legal custody to a nonparent upon a demonstration by a preponderance of the evidence that granting legal custody to the nonparent is in the child's best interest.'" *In re D.E.*, 12th Dist. Warren Nos. CA2018-03-035 and CA2018-04-038, 2018-Ohio-3341, ¶ 53, quoting *In re C.A.*, 12th Dist. Butler No. CA2014-07-165, 2015-Ohio-1410, ¶ 13.

{¶ 37} R.C. 2151.353(A) does not independently set forth factors that a court must consider in determining the child's best interests in a request for legal custody. *See In re*

*M.A.*, 12th Dist. Butler No. CA2011-02-030, 2012-Ohio-545, ¶ 15; *In re G.M.*, 8th Dist. Cuyahoga No. 95410, 2011-Ohio-4090, ¶ 15. As the paramount concern is the best interest of the child, the court "should consider the totality of the circumstances affecting the best interest of the child." *In re S.L.*, 12th Dist. Butler Nos. CA2012-07-137 thru CA2012-07-142 and CA2012-07-147 thru CA2012-07-149, 2013-Ohio-781, ¶ 54; *In re M.A.* at ¶ 16. A court may therefore consider the relevant best interest factors set forth in either R.C. 3109.04(F) or R.C. 2151.414(D) in determining the best interest of the child. *In re. S.L.* at ¶ 54; *In re A.B.*, 6th Dist. Lucas No. L-18-1136, 2018-Ohio-4206, ¶ 11. Such factors include, but are not limited to (1) the wishes of the child's parents regarding the child's care; (2) the child's interaction and interrelationships with the child's parents, siblings, and any other person who may significantly affect the child's best interest; (3) the child's adjustment to home, school, and community; and (4) the mental and physical health of all persons involved in the situation. *See* R.C. 3109.04(F)(1)(a), (c), (d), and (e).

{¶ 38} A reviewing court will not reverse a juvenile court's custody decision absent an abuse of discretion. *In re A.C.*, 12th Dist. Clermont No. CA2006-12-105, 2007-Ohio-3350, ¶ 15. An abuse of discretion constitutes more than an error of law or judgment; it requires a finding that the trial court acted unreasonably, arbitrarily, or unconscionably. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). "The discretion granted to a juvenile court in custody matters 'should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned.'" *In re A.C.* at ¶ 15, quoting *In re A.W.-G.*, 12th Dist. Butler No. CA2003-04-099, 2004-Ohio-2298, ¶ 6.

{¶ 39} After a thorough review of the record, we find that the juvenile court did not abuse its discretion in denying Paternal Grandfather's motion for legal custody. We further

find that the manifest weight of the evidence supports the court's denial of Paternal Grandfather's motion. The record reveals that Paternal Grandfather has never met or spoken with three-year-old K.S. Despite learning from Mother in October 2017 about the Agency's involvement and K.S.'s placement into foster care, Paternal Grandfather did not seek to become involved in the case until the date of the permanent custody hearing. He also did not file a motion seeking visitation or contact with the child during the pendency of the case. K.S., therefore, had no bond or relationship with Paternal Grandfather. Conversely, K.S. had bonded to his foster family and was doing well in the family's care. K.S. had undergone occupational, speech, and physical therapy and could carry on conversations, say full sentences, and recognize people and colors. By all accounts, K.S. appeared to be thriving in his current placement.

{¶ 40} Paternal Grandfather testified he was willing to care for K.S. and had the financial means to do so. However, because of the late filing of Paternal Grandfather's motion for legal custody, there had been no investigation into whether he would be an appropriate custodian for K.S. K.S.'s caseworker testified that Paternal Grandfather's home state of Wisconsin would have to do a background check, fingerprinting, and a home study before Paternal Grandfather could be considered for placement, and that process could take up to a year. The juvenile court found that K.S. was in present need of legally secure placement and his "only chance at stability [was] to be placed in the permanent custody of WCCS so they [could] arrange for the Child to be adopted, hopefully through [the] same foster family."

{¶ 41} Paternal Grandfather suggests that the Agency is at fault for his delay in seeking to become involved in the juvenile case. He contends that the Agency should have contacted him as an alternative placement for K.S. when the Agency's' involvement began.

However, "an agency's duty to use reasonable efforts to prevent a child's removal from the home does not include the duty to use reasonable efforts to place the child with relatives." *In re S.E.*, 12th Dist. Clermont No. CA2008-05-046, 2008-Ohio-5300, ¶ 26. *See also In re A.C.*, 2007-Ohio-3350 at ¶ 16 (noting that the language set forth in R.C. 2151.412[H][2] that provides that if a child cannot be placed in the legal custody of his parents, the child should be placed "in the legal custody of a suitable member of the child's extended family" is "precatory, not mandatory"). K.S.'s caseworker testified that neither Father nor Mother had contacted the Agency identifying Paternal Grandfather as a person willing to take custody of K.S. Mother in particular had Paternal Grandfather's contact information but did not provide the information to the Agency because Mother "didn't want [K.S.] to be in anybody else's care." The Agency, therefore, is not to blame for the timing of Paternal Grandfather's involvement in the case.

{¶ 42} Accordingly, for the reasons set forth above, we find no error in the juvenile court's denial of Paternal Grandfather's motion for legal custody. It was in K.S.'s best interest for Paternal Grandfather's motion for legal custody to be denied and for permanent custody to be granted to the Agency. Paternal Grandfather's sole assignment of error is, therefore, overruled.

## Mother's Appeal

{¶ 43} Counsel for Mother has filed a brief with this court pursuant to *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396 (1967), which (1) indicates that a careful review of the record from the proceedings below fails to disclose any errors by the juvenile court prejudicial to the rights of Mother upon which an assignment of error may be predicated; (2) lists five potential errors "that might arguably support the appeal," *Anders* at 744; (3) requests that this court review the record independently to determine whether the proceedings are free from

prejudicial error and without infringement of Mother's constitutional rights; (4) requests permission to withdraw as counsel for Mother on the basis that the appeal is wholly frivolous; and (5) certifies that a copy of both the brief and motion to withdraw have been served upon Mother.

**{¶ 44}** Having allowed Mother sufficient time to respond, and no response having been received, we have accordingly examined the record and find no error prejudicial to Mother's rights in the proceedings in the juvenile court. Therefore, the motion of counsel for Mother requesting to withdraw as counsel is granted, and Mother's appeal is hereby dismissed for the reason that it is wholly frivolous.

## Conclusion

**{¶ 45}** The assignment of error raised by Paternal Grandfather is overruled and the juvenile court's decision denying Paternal Grandfather's motion for legal custody and granting the permanent custody to WCCS is affirmed. Mother's appeal is dismissed and her counsel's request to withdraw is granted.

S. POWELL and RINGLAND, JJ., concur.