[Cite as *In re F.B.*, 2022-Ohio-499.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BROWN COUNTY

| | | |
|---|---|---|
| IN RE: | : | |
| F.B., et al. | : | CASE NO. CA2021-03-002 |
| | : | O P I N I O N<br>2/22/2022 |
| | : | |
| | : | |
| | : | |

APPEAL FROM BROWN COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case Nos. 2013-3184, 2019-3172, and 2019-3173

Dever Law Firm, and Scott A. Hoberg, for appellant.

Zachary A. Corbin, Brown County Prosecuting Attorney, and Courtney A. Worley, Assistant Prosecuting Attorney, for appellee.

**BYRNE, J.**

{¶1} Mother appeals from the decision of the Brown County Court of Common Pleas, Juvenile Division, which denied her motion for legal custody of her biological children, Fae and Mary, and which granted Brown County Children Services' motions for the children to be placed in the legal custody of their respective custodians.[1] For the reasons discussed

---

1. To preserve the children's privacy, and for ease of reading, we refer to the children using fictitious names, rather than their initials.

below, we affirm the juvenile court's decision.

## I. Procedural and Factual Background

{¶2}   On September 20, 2019, Brown County Children Services ("BCCS") filed a complaint alleging that Fae (then 11 years old), Mary (then 8 years old), and Brad (then 2 years old) ("the children") were abused, dependent, and neglected children.   The complaints alleged that Margaret Breeze was Fae's legal guardian and that Margaret Breeze and her husband Charles Breeze were the legal guardians of Mary and Brad.

{¶3}   The complaint alleged that the Breezes had allowed Fae to become extremely malnourished.   Fae was hospitalized and diagnosed with "Kwashiorkor," a condition in which a severe lack of protein and malnutrition causes "severe abdominal distortion" or a "severely distended stomach."   Fae exhibited considerable abdominal distortion.   Fae reported that the Breezes were feeding her only one bowl of rice a day.

{¶4}   Fae was previously diagnosed with post-traumatic stress disorder ("PTSD"), attention deficit hyperactivity disorder, and reactive attachment disorder ("RAD").   The complaint alleged that despite these diagnoses, Fae had not seen a doctor since 2016.  The complaint further alleged that Fae had gone from being in the 25th percentile for weight for her age to being in the 0.01 percentile for weight.   The complaint alleged that Mary and Brad also resided in the home with Fae and were unable to self-protect due to their ages. BCCS further indicated that due to the emergency nature of the complaint, the agency did not yet know the family history.

{¶5}   Following a hearing, the juvenile court granted temporary custody of the children to BCCS.  Upon her release from the hospital, Fae went to a kinship placement. Mary and Brad were sent to a different foster placement.

{¶6}   In February 2020, BCCS filed an amended complaint containing the same allegations of abuse, dependency, and neglect.  The amended complaint identified Mother

as the biological mother of Fae and Mary.[2]

{¶7}    In May 2020, a magistrate issued a decision that found Fae to be an abused and neglected child.  The magistrate further found that Mary and Brad were dependent children.  The court continued temporary custody with BCCS and the children remained in their respective placements.

{¶8}    In May 2020, Mother moved for legal custody of Fae and Mary.  In June 2020, Mother filed a motion for visitation and asked to be added to BCCS's case plan.

{¶9}    In September 2020, BCCS moved for Mary and Brad to be placed in the legal custody of their foster parent.  In December 2020, BCCS filed a motion asking the court to grant legal custody of Fae to her kinship placement custodians ("custodians").[3]

{¶10}   The juvenile court conducted a hearing on the three legal custody motions in January 2021.  The court indicated that it would take evidence on Mother's motion first.

### A. Mother's Case

{¶11}   Mother testified that she lived in Hebron, Kentucky.  Fae had lived with Mother and Mother's parents for five or six years.  When Fae was six years old, Mother relinquished custody to Margaret Breeze because Fae required "a lot of attention" and Mother had a full-time job.  Mother testified that she also gave the Breezes custody of Mary, when Mary was "just a baby."[4]

{¶12}   The Breezes lived in Brown County, Ohio.  Mother claimed that her pediatrician told her that Fae could get more services in Ohio than in Kentucky.

{¶13}   Mother claimed that after she transferred custody, Margaret Breeze told her

---

2. Fae and Mary have different fathers, neither of which participated in the case.  BCCS identified Brad's biological parents, but they either did not participate in the case or declined to seek custody.

3. The Breezes did not seek to regain legal custody and the record indicates that they were criminally charged for their conduct.

4. The Breezes have some familial connection with Mother.

that she was not allowed to visit Fae.  Mother testified that she was allowed to visit Mary, but that she did not actually visit.  She explained, "it's kind of hard to see one without the other."  She admitted not having seen either daughter since 2013—that is, for approximately seven years.  Mother testified that she never sought visitation because she could not afford an attorney.

{¶14}  Mother testified that she had an alcohol problem when she was 21 years old.  However, she did not currently have an alcohol problem.  She testified that she started smoking marijuana after giving up the children's custody, but also indicated that she no longer used marijuana.

{¶15}  Mother stated that she had been married eight years and had a child with her husband ("Husband"), which child had just turned one the previous November.  She lived with Husband and the child in a three-bedroom home.  Both Mother and Husband worked at an "Ameristop" location.  She earned $11.50 per hour.

{¶16}  Mother testified that she had one other son who was 12 years old.  That son lived with his biological father.  She testified that she would see that son "every time I get the chance" and that she last saw him the previous Sunday.

{¶17}  Mother stated that she was never put on BCCS's case plan(s) for Fae and Mary.  However, she did have a case plan "over there too" and that she had completed "some of it."  Mother was apparently referencing a separate case plan from a Kentucky children services case, which she discussed in more detail during cross-examination.  In that case, she was asked to maintain a stable home and employment.  She was also asked to complete a mental health assessment.  As a result, she took seven hours of parenting classes and an anger management class.  On cross-examination, Mother admitted that her youngest child remained under a Kentucky case plan for services, which had been initiated by children services due to their concern that the child was at risk of neglect and because

- 4 -

Mother had lost custody of her other children. Upon further cross-examination, Mother admitted that she tested positive for marijuana in May 2019 and that her son was born in November 2019. Mother then admitted that this was the reason that Kentucky children services initiated a case with respect to Mother's youngest son.

{¶18} As to why she believed it was in Fae and Mary's best interest to be in her custody, Mother responded that it was a "child's right" to be with their biological mother. Mother further explained that she had "grown up a lot" since giving up custody.[5] She did not drink or smoke marijuana. She had her own house, her own vehicle, and a happy, healthy, baby boy. With regard to a report from the children's guardian ad litem that there was animosity between Fae and Mary, and how she would address that issue, Mother offered that, "well, they are sisters. Sisters do tend to fight."

{¶19} On cross-examination, Mother clarified that Fae would have been 5 years old, and Mary 3 years old, at the time she gave up custody. She agreed that Mary was now 10 years old but stated that the child would not find her a stranger because "there's a connection between a mother and a child."[6]

{¶20} Mother claimed that she became aware of the abuse occurring at the Breezes' residence in 2017 or 2018. However, BCCS played a 2019 video segment from a local news channel. In the segment, Mother spoke to a reporter about the allegations against the Breezes. The reporter stated that Mother had first learned about the abuse *in 2015*. After watching the video, Mother agreed that she had actually learned about the abuse in 2015, and that two videos depicting abusive behavior occurring at the Breezes' home had been sent to her in 2015. Mother stated that she made anonymous tips concerning the

---

5. The record indicates that Mother would have been 32 years old at the time of the hearing.

6. Fae was nearly 13 years old at the time of the legal custody hearing.

abuse to BCCS, but she never followed up. Despite the tip being anonymous, she nonetheless testified that she expected BCCS to follow up with her. Mother later stated that it may have been 2017 when she learned of the abuse but conceded that she knew about the abuse for at least two years prior to the children's removal from the Breezes' home at the request of BCCS.

{¶21} Mother admitted that she was charged with unlawful taking (a theft offense) in 2014. Mother claimed this was a "wrong place wrong time thing."

{¶22} Finally, BCCS cross-examined Mother concerning a mental health assessment she underwent in March 2020. The assessment report indicated that Mother was not forthcoming with the evaluator and that Mother either lied about her mental health issues or denied that she had any mental health issues. As a result, the evaluator could not complete a full, valid mental health assessment. The report stated that, "[Mother's] interest in and motivation for treatment is below average." The report further stated that "[d]ue to the level of [Mother's] defensiveness and her apparent belief of no experiences of marked distress or problems, psychotherapy interventions at this stage would not be recommended." Given Mother's statements during the assessment, the evaluator believed that if psychotherapy interventions were offered to Mother, she "would be highly resistive and non-compliant which ultimately would lead to a potential of early termination of services before any potential outcomes could be instituted."

{¶23} Mother called Husband to testify. Husband testified that he last saw Fae and Mary the same time as Mother. Husband said that the Kentucky children services investigation concerning his and Mother's son was based on "false accusations." He testified that there was a report that they were abusing their son, but he had not even been born yet. On cross-examination, Husband claimed he was unaware that Mother failed a drug test at her primary care physician's office several months prior to the child's birth.

{¶24} Husband testified that he was 29 years old. He later admitted that his date of birth made him 27 years old.

{¶25} Husband admitted two convictions for operating a vehicle while intoxicated. He claimed he was not under the influence in either incident but decided to plead guilty anyway. He claimed that officers from the Covington, Kentucky police department "don't like me. They try to harass me every time they can."

{¶26} Husband was asked when Mother last visited her older son. Husband replied that it had been one or two months prior. When informed that Mother had said she visited the older son the previous Sunday, Husband changed his testimony.

{¶27} Mother's friend ("Friend") testified. Friend stated she met Mother at the Ameristop, where they were coworkers. They became best friends and she had known Mother for three or four years. Friend had seen Mother with her youngest son and said that she was a "very protective mother." As an example, Friend said that Mother had a sign on her baby stroller that read "do not touch." Friend said that Mother took her child to work with her because she could not afford childcare.

## B. BCCS's Case

{¶28} BCCS called Charity Stephenson, who testified that she was the children's caseworker. Stephenson testified that Fae was diagnosed with RAD, anxiety, and PTSD. Mary was diagnosed with RAD and PTSD.[7]

{¶29} Stephenson testified that Fae's custodians were able to ensure that Fae's needs were met and that she was transported to her therapeutic appointments and services. Stephenson stated that Fae was thriving in the care of her custodians and had started attending a brick and mortar school, after having previously attended a virtual school.

---

7. The record reflects that "RAD" is a disorder in which a child who has experienced trauma has difficulty bonding with its caregiver.

{¶30} Stephenson testified that Mary and Brad were placed together, with a foster parent. Mary and Brad were very bonded and considered each other siblings. Stephenson said that both children would be "lost" if they were placed separately. Mary's foster parent was able to meet all of Mary's medical and educational needs. BCCS believed that it was in Mary's best interest that she be placed in the legal custody of her foster parent.

{¶31} Stephenson testified that BCCS was concerned about the possibility of placing Fae and Mary together. Mary was fearful of Fae and stated that Fae had tried to kill her. Neither child asked nor talked about the other child.

{¶32} Stephenson testified as to multiple concerns with the possibility of Mother visiting with and/or receiving custody of the children. With regard to Mary, BCCS was concerned that Mary did not know Mother. Mary did not talk about Mother and had indicated that she did not want to visit with Mother. With regard to Fae, Stephenson stated that there was "no relationship" between Mother and Fae and that Fae had consistently stated that she wanted no contact with Mother. Fae had stated that Mother had lived in a trailer in front of the Breezes' home and was aware that the abuse was occurring. Fae had also indicated that if she was to see Mother, it would only be to tell her she hates her for not protecting her from the Breezes. Stephenson believed that Mother was incapable of understanding or addressing Fae's mental health issues.

{¶33} Stephenson stated that BCCS was also concerned over Mother's failure to act for several years despite her awareness of abuse by the Breezes. Stephenson denied Mother's claim that she submitted an anonymous tip to BCCS. Stephenson stated that BCCS was only made aware of the videos of Fae and Mary's abuse after Mother released them to the local news channel in 2019.

{¶34} Stephenson testified that Mother failed her first interstate compact study. She passed her second study, but Stephenson testified that the information listed on that study

- 8 -

was incorrect. It did not reflect Mother's previous cases with children services. Stephenson said that Mother had three substantiated abuse and neglect cases in which Fae and Mother's older son were the victims.

## C. Juvenile Court's Decision

{¶35} Following the hearing, the juvenile court issued a written decision denying Mother's motion for legal custody and granting BCCS's motions. The court indicated it had considered the statutory best interest factors relevant to a legal custody motion. After a review of these factors and the facts adduced at the hearing, the court determined that it was not in Fae and Mary's best interest to be placed in Mother's legal custody. In so finding, the court noted that it found that Mother and Husband were not credible witnesses. The court noted that Mother was aware of abuse that was occurring yet failed to take any real action to protect the children. The court further found that Mother had had minimal, if any, contact with the children since she gave the Breezes custody. The court found that the children had no relationship or bond with Mother.

{¶36} Instead, the court found that it was in Fae's best interest to be placed in the legal custody of her custodians and in Mary's best interest to be placed in the legal custody of her foster parent. The court found that Mary and Fae were happy, healthy, and stable in their respective placements and were bonded with the custodians/foster parent. The court further noted that the children had expressed to their guardian ad litem a desire to remain in their placements.

## II. Law and Analysis

{¶37} Mother appealed, raising two assignments of error.

{¶38} Assignment of Error No. 1:

{¶39} IN A CHILD CUSTODY CASE, THE TRIAL COURT ERRED IN ITS DECISION AND ORDER GRANTING LEGAL CUSTODY OF THE CHILDREN ON THE

AGENCY'S MOTION DESPITE THE MANIFEST WEIGHT OF THE EVIDENCE THAT THE CHILDREN'S BEST INTEREST WAS SERVED BY GRANTING MOTHER LEGAL CUSTODY.

{¶40} Mother argues that the juvenile court's decision to deny her motion for legal custody, and to instead grant BCCS's motions for legal custody, was against the manifest weight of the evidence.

**A. Standard of Review**

{¶41} R.C. 2151.353(A)(3) authorizes a juvenile court to award legal custody of a child who is adjudicated dependent "to either parent or to any other person who, prior to the dispositional hearing, files a motion requesting legal custody of the child* * *." A juvenile court may award legal custody to a nonparent upon a demonstration by a preponderance of the evidence that granting legal custody to the nonparent is in the child's best interest. *In re C.A.*, 12th Dist. Butler No. CA2014-07-165, 2015-Ohio-1410, ¶ 13. "Where an award of custody is supported by a substantial amount of credible and competent evidence, such an award will not be reversed as being against the weight of the evidence by a reviewing court." *In re T.M.*, 12th Dist. Butler No. CA2007-01-019, 2007-Ohio-6034, ¶ 28, citing *Davis v. Flickinger*, 77 Ohio St.3d 415, 418 (1997). The presumption in weighing the evidence is in favor of the finder of fact, which we are especially mindful of in custody cases. *In re C.Y.*, 12th Dist. Butler Nos. CA2014-11-231 and CA2014-11-236 thru CA2014-11-238, 2015-Ohio-1343, ¶ 25. Therefore, "'[i]f the evidence is susceptible to more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" *In re A.B.*, 12th Dist. Brown No. CA2016-11-021, 2017-Ohio-5776, ¶ 13, quoting *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 21.

{¶42} The juvenile court enjoys broad discretion in custody proceedings. *In re*

*E.L.C.*, 12th Dist. Butler No. CA2014-09-177, 2015-Ohio-2220, ¶ 16. The standard of review in custody decisions is whether the juvenile court abused its discretion. *C.D. v. D.L.*, 12th Dist. Fayette No. CA2006-09-037, 2007-Ohio-2559, ¶ 14. An abuse of discretion implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). "The discretion that a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *In re A.B.*, 12th Dist. Brown No. CA2016-11-021, 2017-Ohio-5776, ¶ 12, citing *In re C.A.*, 12th Dist. Butler No. CA2014-07-165, 2015-Ohio-1410, ¶ 15. A reviewing court must not substitute its judgment for that of the juvenile court when applying the abuse of discretion standard. *Morrison v. Robinson*, 12th Dist. Fayette No. CA2012-06-019, 2013-Ohio-453, ¶ 26.

{¶43} R.C. 2151.353(A) does not independently set forth factors that a court must consider in determining the child's best interests in a request for legal custody. *In re K.S.*, 12th Dist. Warren Nos. CA2019-01-009 and CA2019-02-015, 2019-Ohio-2384, ¶ 37. As the paramount concern is the best interest of the child, the court "should consider the totality of the circumstances affecting the best interest of the child." *In re S.L.*, 12th Dist. Butler Nos. CA2012-07-137 thru CA2012-07-142 and CA2012-07-147 thru CA2012-07-149, 2013-Ohio-781, ¶ 54. A court may therefore consider the relevant best interest factors set forth in either R.C. 3109.04(F) or 2151.414(D) in determining the best interest of the child. *In re. S.L.* at ¶ 54. *Accord* R.C. 2151.23(F)(1) ("The juvenile court shall exercise its jurisdiction in child custody matters in accordance with sections 3109.04 * * *."). Such factors include but are not limited to (1) the wishes of the child's parents regarding the child's care; (2) the child's interaction and interrelationships with the child's parents, siblings, and any other person who may significantly affect the child's best interest; (3) the child's

adjustment to home, school, and community; and (4) the mental and physical health of all persons involved in the situation. R.C. 3109.04(F)(1)(a), (c), (d), and (e).

**B. Analysis**

{¶44} Mother argues that she was the only biological parent who appeared at the hearing and there was no direct evidence of the children's wishes because the court did not interview the children in camera. Mother contends that she submitted evidence that she was employed and compliant with child support, and that she completed parenting and anger management courses.

{¶45} Upon review of the record, we do not find that the juvenile court abused its discretion in denying Mother's motion for legal custody and instead granting legal custody as requested by BCCS. The evidence in this case indicating Mother should not receive custody was overwhelming.

{¶46} Mother's only rationale why she should receive custody was that it was her right as the biological Mother. We acknowledge a parent's fundamental right to raise their child and that the "'custody, care and nurture of the child reside first in the parents.'" *In re Cullen,* 12th Dist. Warren No. 448, 1981 WL 5144, *3 (June 26, 1981), quoting *Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S.Ct. 438 (1944). However, the juvenile court was not required to give custody of Fae and Mary to Mother when the facts so clearly demonstrated that this was not in their best interests. *In re Adoption of Kreyche*, 15 Ohio St.3d 159, 162 (1984) (holding that in all custody matters, the paramount concern is the best interest of the child).

{¶47} Mother gave up custody of Fae and Mary in 2013, when they were both very young. She admitted to a doctor that she could not "handle" Fae. She conceded that she had not seen either child after giving up custody. As of the time of the hearing, no relationship or bond existed between Mother and the children.

{¶48} Perhaps most significantly, the evidence indicated that Mother was aware that Fae was being abused in the Breeze home yet she failed to take any action for years. Mother's claim that she reported the abuse anonymously lacked credibility. She claimed she made the tip anonymously and then testified that she expected to be contacted by BCCS. She also admitted not following up on her tip.

{¶49} Mother also claimed she no longer had substance abuse issues, but the evidence showed she had just recently been found to be abusing narcotics while pregnant, which drug use led to the initiation of a children services case in Kentucky. Both Mother and Husband were not forthcoming concerning the cause and status of that case.

{¶50} At the time of the hearing Mother was taking her youngest child to work with her at a gas station because she could not afford childcare. There was no evidence presented that would suggest that Mother could take on the responsibility of two children with significant mental health issues that would require years of therapeutic services. Furthermore, the evidence was unrefuted that placing Fae in the same household as Mary would be detrimental, and that separating Mary from Brad would not be in Mary's best interests. Mother's mental health assessment indicated that she was deceptive and lacked enthusiasm regarding participating in treatment services.

{¶51} Mother cites no authority for the proposition that in a legal custody case, the court must interview the children in camera in order to consider their wishes. As stated above, courts have looked to the factors set forth under R.C. 3109.04(F)(1) and 2151.414(D) for guidance in assessing a legal custody motion. R.C. 3109.04(F)(1), regarding parental rights in shared parenting, does require an in camera interview in order to consider the wishes of the child. R.C. 3109.04(F)(1)(b). On the other hand, R.C. 2151.414(D), concerning permanent custody, provides that the court may consider the wishes of the child if expressed through the guardian ad litem. R.C. 2151.414(D)(1)(b).

{¶52} Mother did not object to the caseworker's testimony concerning the children's wishes and in fact elicited testimony concerning the children's wishes. Even if we assumed that it was error to consider the children's wishes as relayed through the caseworker, any such error would fall under the invited error doctrine. Under the "invited error" doctrine, a party is not permitted to take advantage of an error which he himself invited or induced the court to make. *In re J.T.S.*, 12th Dist. Preble No. CA2014-09-009, 2015-Ohio-364, ¶ 14. Moreover, the wishes of the children were expressed through the guardian ad litem's report. Thus, even if the court had sua sponte stricken the caseworker's testimony, the children's wishes would have been conveyed to the court through other means.

{¶53} The greater weight of the evidence demonstrated that both Fae and Mary were thriving in their respective placements. Both their caretakers were ensuring that they had all their needs addressed and were transported to all their necessary therapeutic services. For all of the foregoing reasons, the juvenile court did not abuse its discretion in denying Mother's motion and granting BCCS's motions and the juvenile court's decisions were not against the manifest weight of the evidence. We overrule Mother's first assignment of error.

{¶54} Assignment of Error No. 2:

{¶55} IN A CHILD CUSTODY CASE, THE TRIAL COURT ERRED IN FAILING TO ADDRESS MOTHER'S MOTION FOR VISITATION IN GRANTING LEGAL CUSTODY TO THE INDIVIDUALS IDENTIFIED BY AGENCY.

{¶56} Mother moved the juvenile court for visitation with Mary and Fae shortly after filing her legal custody motion. Subsequently, the parties appeared before a magistrate for a hearing. The magistrate later issued a decision that reflected that the children's guardian ad litem agreed (at that time) that Mother should be allowed visitation with the children, at BCCS's sole discretion.

{¶57} However, the magistrate's decision went on to indicate that a hearing on Mother's motion for custody and her motion for visitation was scheduled for a later date. Thus, the decision indicated that the issue of Mother's request for visitation was not resolved. No objections were filed to the magistrate's decision.

{¶58} At the start of the legal custody hearing, the juvenile court listed what it believed to be the motions pending at the time. The court noted that Mother had moved for legal custody of Fae and Mary and that BCCS had filed two legal custody motions concerning the children. The court did not mention Mother's motion for visitation. The court then asked counsel if the motions that the court had described accurately summarized what was to be decided that morning. Mother's counsel responded affirmatively.

{¶59} The judgment entry granting legal custody reflected that the hearing was to address "all pending motions" and listed the three legal custody motions, but did not mention or address Mother's motion for visitation.

{¶60} Upon review, it appears that the magistrate partially granted Mother's motion for visitation. Mother was permitted visitation, albeit in the discretion of BCCS. The magistrate's decision, however, does reflect that the court would continue to consider the issue of visitation and that the matter would be addressed at a subsequent hearing.

{¶61} The court did not refer to Mother's motion for visitation at the hearing, nor did the parties. Where a court fails to mention or rule on a pending motion, we presume that the motion was implicitly overruled. *State ex rel. The V. Cos. v. Marshall*, 81 Ohio St.3d 467, 469 (1998); *State v. Ryerson*, 12th Dist. Butler No. CA2003-06-153, 2004-Ohio-3353, ¶ 52.

{¶62} Here, the record makes clear that the juvenile court implicitly denied Mother's motion for visitation. Much of the testimony revolved around the propriety of Mother establishing contact with the children. As described in response to the first assignment of

error, the evidence was unequivocal that the children had no interest in having any interactions with Mother. Moreover, BCCS believed it would not be in the children's best interest to have any contact with Mother.

{¶63} Finally, we note that Mother does not argue the merits of the motion for visitation. Mother's second assignment of error only concerns the trial court's alleged failure to "address" her motion for visitation. But as just stated, the trial court implicitly denied the motion for visitation. For the reasons described in response to the first assignment of error, the motion for visitation was meritless. We overrule Mother's second assignment of error.

### III. Conclusion

{¶64} The juvenile court's decision to deny Mother's legal custody motion and grant BCCS's legal custody motions was not an abuse of discretion and was supported by the greater weight of the evidence. No error occurred with respect to the lack of an express denial of Mother's motion for visitation; the juvenile court implicitly denied the motion, and Mother does not argue that the trial court erred in this regard.

{¶65} Judgment affirmed.

PIPER, P.J., and S. POWELL, J., concur.