[Cite as *In re X.L.L.*, 2023-Ohio-751.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BROWN COUNTY

IN RE:                                          :

X.L.L.                                          :          CASE NO. CA2022-03-003

                                                :          O P I N I O N
                                                           3/13/2023
                                                :

                                                :

                                                :


APPEAL FROM BROWN COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 20203161


Zachary A. Corbin, Brown County Prosecuting Attorney, and Courtney A. Worley, Assistant Prosecuting Attorney, for appellee.

Dever Law Firm, and Scott A. Hoberg, for appellant.


**BYRNE, J.**

{¶1}    Grandmother, the former legal custodian of the minor child "Xavier," appeals from the decision of the Brown County Court of Common Pleas, Juvenile Division, which granted legal custody of Xavier to "Mary," a relative.[1]  For the reasons described below, we

---

1. "Xavier" and "Mary" are pseudonyms, adopted in this opinion for purposes of privacy and readability.  *See In re D.P.*, 12th Dist. Clermont Nos. CA2022-08-043 and CA2022-08-044, 2022-Ohio-4553, ¶ 1, fn.1.

affirm the juvenile court's decision.

## I. Facts and Procedural History

### A. Dependency Complaint

{¶2} On November 12, 2020, the Brown County Department of Job and Family Services ("BCDJFS") filed a complaint alleging that Xavier, then five years old, was a dependent child pursuant to R.C. 2151.04(B). In the complaint, BCDJFS alleged that Grandmother was Xavier's maternal great-grandmother and had been his legal custodian since 2015. BCDJFS further alleged that it received reports from multiple sources that reported concerns for Xavier's safety while in Grandmother's care. Specifically, BCDJFS on November 5, 2020 received a report that Grandmother had given physical custody of Xavier to a "family friend" and that she had done this previously. Grandmother later reported to police that the "family friend" had abducted Xavier. Law enforcement contacted the friend to return Xavier. The friend complied.

{¶3} BCDJFS contacted Grandmother to inquire about this situation. She informed BCDJFS that Xavier was in her care but refused to provide her location and stated she was going to leave the state. Grandmother struggled to give a consistent timeline of events and reported that she was emotionally struggling due to several recent deaths in her family. Grandmother's husband, brother, and first cousin had all died in a short period of time. Grandmother's grandson was also shot and killed. (The timing of this incident is unclear, and Grandmother's testimony suggests her grandson may have been shot on two separate occasions.)

{¶4} BCDJFS further alleged that it received reports that Grandmother was abusing her prescription medication and was mentally unstable. BCDJFS contacted Xavier's biological mother, who stated that she was not able to provide for Xavier. BCDJFS alleged that "Mary," who was described in the record as Grandmother's first cousin and

Xavier's fourth cousin, was willing and able to take temporary custody.

{¶5}　On the same day that BCDJFS filed the complaint, it moved the juvenile court to grant temporary custody to Mary.　The juvenile court held a shelter care hearing.　The court thereafter granted temporary custody to Mary and granted protective supervision over Xavier to BCDJFS.

### B. Case Plan for Reunification

{¶6}　In December 2020, BCDJFS and Grandmother entered into a case plan with the goal of reunifying Grandmother with Xavier.　BCDJFS indicated that Grandmother would need to maintain safe and stable housing and income, maintain contact with BCDJFS and follow all of BCDJFS's recommendations, attend and participate in a psychological evaluation, attend and participate in a drug/alcohol assessment, attend and participate in parenting education classes and individual sessions, attend all scheduled and needed medical and specialist appointments, follow all related recommendations, and only take prescribed medications.

### C. Adjudicatory Hearing

{¶7}　The juvenile court held an adjudicatory hearing.　The court thereafter issued a judgment entry reflecting that the parties stipulated to the complaint as written.　The court found Xavier dependent.　The juvenile court continued temporary custody with Mary.

### D. Motions for Custody and Dispositional Hearing

{¶8}　In April 2021, Grandmother filed a motion for legal custody of Xavier. Grandmother stated that she had completed her case plan for reunification and argued that BCDJFS had refused to facilitate visitation between her and Xavier.　In October 2021, BCDJFS moved the juvenile court to grant legal custody of Xavier to Mary.

{¶9}　In January 2022, the court held a dispositional hearing on the pending motions

for legal custody. The following is a summary of the evidence presented.[2]

### i. Caseworker Charity Stephenson

{¶10} Charity Stephenson testified that she was a caseworker for BCDJFS. Stephenson relayed that Grandmother received legal custody of Xavier in 2015 from a case originating from a different Ohio county.

{¶11} At the beginning of this case, BCDJFS received notice that Grandmother was leaving Xavier with random people and that his needs were not being met while Grandmother cared for an adult grandson who had been shot. BCDJFS had also received reports that Grandmother was driving erratically while taking Xavier to school and that she had planned to pull Xavier out of school, leave the state with Xavier, and not return.

{¶12} When Grandmother came into BCDJFS's office, she provided a drug screen that was positive for benzodiazepine, oxycontin, and opiates. She provided BCDJFS with a list of at least 30 different medications she had been prescribed, some of which were narcotics. BCDJFS had concerns about Grandmother's prescription drug use. Grandmother had several different medical providers prescribing her with different medications and there was a concern that she was "doctor hopping." Stephenson stated that the only prescription medication that Grandmother took consistently was oxycontin.

{¶13} Stephenson testified that BCDJFS was concerned about neglect of Xavier by Grandmother, abuse of medications by Grandmother, and Grandmother's mental health issues. In December 2020, BCDJFS offered Grandmother various case plan services including parenting education and mental health assistance. BCDJFS added anger management services following a psychological assessment and allegations that

---

2. For readability purposes, we have organized the presentation of evidence in a different order than presented at the hearing. We also note that hearsay evidence was offered at numerous points during the hearing by multiple witnesses. We consider such testimony when no objection was made by counsel or sustained by the juvenile court. *See Streifthau v. Streifthau*, 12th Dist. Butler No. CA84-08-087, 1985 WL 8676, *5 (May 20, 1985). Grandmother did not assign error on appeal with regard to hearsay testimony.

Grandmother had chased someone in her car and had also chased a grandson down a highway while holding a metal pipe.

{¶14} Grandmother went to New Hope, a community services center, and was referred for weekly therapy as well as a drug/alcohol assessment because of concerns over abuse of her prescription medications.

{¶15} Regarding Grandmother's involvement with BCDJFS, Stephenson testified that Grandmother did maintain contact with BCDJFS as required. Stephenson had not visited Grandmother's home and would not do so because of safety concerns due to Grandmother's emotional instability and erratic behavior. Stephenson noted that Grandmother had come to the juvenile court on a previous court date with a fake gun.

{¶16} Stephenson noted that Grandmother had stable income and housing and that she had completed a parenting program with Dr. Eugene Smiley. Grandmother had also complied with her drug/alcohol assessment requirement.

{¶17} Despite Grandmother's completion of the case plan services recommended by BCDJFS, Stephenson stated that Grandmother's concerning behaviors had not changed. Stephenson stated that Grandmother's interactions with Xavier during supervised visitations had not improved. Grandmother did not interact with Xavier in the way a parent interacts with a child; rather, she interacted with him as a grandparent not involved in daily parenting. Stephenson explained Grandmother did not provide "structure" during her visits with Xavier, and that there was only limited communication between the two of them. Stephenson described that Grandmother would be "coloring" while Xavier was "off doing random things." Stephenson noted that when the case began, Xavier, then five years old, could not count to 10, spell his name, or recognize his ABCs. Grandmother spoke to Xavier as if he was a baby and his speech was very baby-like.

{¶18} Stephenson stated that at the beginning of the case, Grandmother was

erratic, paranoid, and difficult to engage with in a stable conversation. Grandmother had accused a previous BCDJFS employee of "kidnapping" Xavier and continued to make those accusations. Since participating in counseling, Grandmother's mental health issues had improved. Nonetheless, BCDJFS was concerned that Grandmother continued to lack the ability to take responsibility for her mental health issues. Stephenson stated that Grandmother refused to acknowledge any of her concerning behaviors, mood changes, and anger issues.

{¶19} Stephenson testified that Xavier had informed her, numerous times, that he wanted to live with Mary. Stephenson said that Xavier wanted to visit with Grandmother but did not want to live with her. Xavier's biological mother also wanted Xavier to be placed with Mary.

{¶20} BCDJFS believed that all of Xavier's needs were being met by Mary and recommended that the court grant legal custody to Mary and visitation with Grandmother at Mary's discretion.

**ii. Dr. Eugene Smiley**

{¶21} Dr. Eugene Smiley testified that he was a professional clinical counselor who contracted with BCDJFS to provide parenting education. BCDJFS referred Grandmother to Dr. Smiley in November 2020. He wrote a parenting capacity report, which was filed with the court. The report summarized Grandmother's participation in Dr. Smiley's parenting program and outlined Dr. Smiley's concerns with Grandmother's parenting ability. The report was admitted into evidence at the dispositional hearing and Dr. Smiley testified as to its contents. The juvenile court allowed Dr. Smiley to testify as an expert witness.

{¶22} Dr. Smiley testified that Grandmother took a test titled the "Adult-Adolescent Parenting Inventory-2" ("AAPI"). The AAPI purports to indicate the potential for a child being abused by a parent based on the parent's responses to questions about child rearing

practices.[3] As a whole, Dr. Smiley testified that Grandmother's responses on the AAPI were in the "below average" to "average" range. Dr. Smiley opined that based upon Grandmother's responses on the AAPI, she demonstrated a "rudimentary," "below-average to average" understanding of parenting.

{¶23} Dr. Smiley was also concerned regarding the number of Grandmother's prescribed medications. Grandmother had reported several past and present health issues but the fact that she had 30 different prescriptions over the past 20 months appeared excessive and confusing. Dr. Smiley believed there was reason to be concerned with possible over-dependence/misuse of prescribed medications. In this regard, Dr. Smiley was concerned by Grandmother's statement to him that she was "weaning" herself off her medication.[4]

{¶24} Dr. Smiley was concerned regarding Grandmother's denial that there were any issues regarding her custody of Xavier. He observed that she took no responsibility for the matters that led to Xavier's removal and the child protective services case. Dr. Smiley testified that Grandmother stated that "they're messing with me" and that "everybody is lying on me." Dr. Smiley observed that Grandmother lacked self-awareness. He opined that it was difficult for Grandmother to trust the judgment of mental health professionals relative to her diagnoses and need for treatment. She lacked understanding of how she came across to others.

{¶25} Dr. Smiley opined that Grandmother tended to overreact and retaliate. He noted an incident involving a relative in which she chased after another vehicle in anger. Dr. Smiley believed there was reason to be concerned that Grandmother may overreact in

---

3. No attempt to validate the AAPI test was made at the hearing, and no party objected to the lack of validation.

4. The record is unclear regarding whether Dr. Smiley's testimony regarding Grandmother's prescription drug use fell within his area of professional expertise.

a similar way when faced with an especially stressful moment in parenting Xavier.

{¶26} Dr. Smiley observed that Grandmother had suffered many losses of loved ones in 2020. Dr. Smiley believed that in light of these losses, Grandmother felt that having custody of Xavier was necessary to her purpose and meaning. Dr. Smiley concluded that Grandmother's personal sense of purpose and meaning were more important to her than Xavier's actual wellbeing.

{¶27} Dr. Smiley was concerned with a psychological report in which Grandmother made a statement that most people irritated her. This statement, along with Grandmother's poor scores on the AAPI, concerned him as to what would happen when seven-year-old Xavier began to irritate Grandmother. He noted that Xavier had attention-deficit/hyperactivity disorder and would be active, pushing, resisting, and talking back.

{¶28} Dr. Smiley stated that his overall concern was with Grandmother's mental stability, anger issues, and medication issues, all of which he believed may be an unintentional threat to Xavier's wellbeing. Dr. Smiley was further concerned about Grandmother leaving Xavier with random people. Xavier had told Dr. Smiley that Grandmother would "drop him off everywhere." Dr. Smiley noted that Xavier contrasted Grandmother's behavior with Mary's behavior. Xavier stated that Mary "would never drop me off anywhere." Xavier was afraid to go with Grandmother because he thought she would not bring him back. Xavier told Dr. Smiley that he would like to live with Mary and that he feels safe living with her. If given the option of running to Grandmother or Mary if someone was hurting him, he would run to Mary.[5]

{¶29} Xavier told Dr. Smiley that he loves Grandmother. Dr. Smiley believed that

---

5. Dr. Smiley also testified that Xavier told him that Grandmother once left him in a bed with someone named "Rob," that it was "scary," and that Xavier got out of bed "really fast." No other details were provided, and what little testimony was offered was vague. Because this testimony was not fully developed on the record, we are unable to draw any conclusion.

Xavier should visit with Grandmother, but he did not think she could provide the stability he needs for purposes of a legal custody arrangement.

### iii. Rachel Triplett

{¶30} Rachel Triplett was Xavier's guardian ad litem. Triplett testified concerning her observation of supervised visits between Grandmother and Xavier. According to Triplett, Grandmother had issues at an initial visit where she was not "coherent." This issue was addressed and never happened again. But Triplett observed that subsequent visits were not productive. Grandmother would not redirect Xavier and there was "no real interaction." Triplett believed that Xavier was educationally neglected while in Grandmother's custody, and that Grandmother was also unable to care for Xavier's medical needs and other day-to-day needs.

{¶31} Triplett also observed Xavier with Mary. She concluded that Xavier was bonded with Mary and saw her as his "safe space." She had no concerns regarding Mary's interaction with Xavier.

{¶32} Triplett recommended that the court grant legal custody to Mary and provide visitation with Grandmother at Mary's discretion. Triplett stated that Xavier was adamant in discussions with her that he wanted to live with Mary and did not want to live with Grandmother but that he did want to visit with Grandmother.

### iv. Mary

{¶33} Mary testified that she was Grandmother's first cousin and Xavier's fourth cousin. Before the BCDJFS case occurred, Grandmother had asked her to babysit Xavier. At that time, she told Grandmother that Xavier did not know her and that, for that reason, "you can't just bring him here and drop him off." Nonetheless, Mary testified that she was one of the people who Grandmother left Xavier with, and that Grandmother had left Xavier with her for two weeks. Mary had observed Xavier storing his excess clothes in his bed.

She believed he was keeping his clothes nearby so that if he had to go anywhere for a long time, he could take his clothes with him.

{¶34} Mary testified that Xavier had many behavioral issues when he was initially placed with her. He was behaving erratically, he was getting into trouble at school, and he was having outbursts. Mary testified that she enrolled Xavier in therapy. When she was told that Xavier's school wanted to hold him back in Kindergarten, she worked hard with him to improve his learning and behavior. She worked with the school principal, psychologist, and Xavier's teacher, and both his learning and behavior markedly improved. By the time of the dispositional hearing, Xavier was still having some behavioral issues, but he understood there were rules he had to follow and that he could not have an outburst when he did not get his way. Mary stated he was doing "much better" in school.

{¶35} When Xavier first came to live with Mary, she noted he had "black spots in his teeth." When she took Xavier to the dentist, she discovered he had two or three broken teeth, several cavities, and needed two caps. Xavier was placed under anesthesia and had six teeth pulled as well as other work completed. Xavier was also taking several prescription medications for blood pressure, anger, and ADHD. Mary testified that she has provided Xavier with appropriate physical and psychological treatment.

{¶36} Mary testified that she would never keep Xavier from visiting with Grandmother. She stated that Grandmother "has his best interest" in mind and "really wants good for him," and that Grandmother "loves him, and I know he loves her." Nonetheless, she was concerned that Grandmother was not providing proper rules and boundaries for Xavier during visits. Mary testified that Grandmother would frequently allow Xavier to play on her phone during their visits, rather than engaging with him. She stated that in an ideal world, she would like Grandmother to have overnight visitation with Xavier, but that they are not there yet. Before reaching that point, Mary stated she would like Xavier to express a

desire to stay overnight with Grandmother, and that she "would like to see [Grandmother] come and spend [more time] with him, focusing on him. Not me, not the surroundings, not a phone, but her and him interacting together doing things." Ultimately, she said, "I don't want to keep him from her, if he does come with me," and "I want her to have a better relationship than she does, a structured one."

### v. Lori Blackburn

{¶37} Lori Blackburn testified that she was an educator with "Child Focus" and had worked with Mary and Xavier, specifically assisting Mary with parenting a five-year-old that never previously had any structure or discipline in his life. Blackburn met with Mary and Xavier weekly for several months. After Xavier began to demonstrate progress, those meetings switched to bi-weekly.

{¶38} When Blackburn first started meeting Xavier and Mary, Xavier was frequently misbehaving at school. He could not recite his ABCs, his numbers, or write his name. He had missed 20 days of school in the first few months of his kindergarten year while he was in Grandmother's custody. Blackburn stated that she had observed considerable progress with Xavier's behavior and schooling since she, Mary, and Xavier began to meet.

### vi. Grandmother's Case in Chief

{¶39} Grandmother introduced the testimony of several friends or acquaintances who testified that they had never known Grandmother to act erratically. Grandmother testified and stated that the allegations made against her in November 2020 concerning her leaving Xavier with a family member were not true. She stated that she was struggling in 2020 due to the death of several family members. She agreed that it was in Xavier's best interest that he was removed from her when she was going through those struggles. Grandmother also agreed that Mary took good care of Xavier.

{¶40} Grandmother read a "letter" to the court as her closing argument. In it, she

accused her daughter and two of her grandchildren, including Xavier's biological mother, of reporting her to BCDJFS and orchestrating a "kidnapping" of Xavier. She also accused BCDJFS of authorizing the "kidnapping." She denied the allegations against her that led to Xavier's removal.

**E. Juvenile Court Decision**

{¶41} On March 3, 2022, the juvenile court issued its decision finding it in Xavier's best interest that legal custody be granted to Mary. The court found that Grandmother was correct that some family and friends had "worked against her" at the time of Xavier's removal.[6] Nonetheless, the court observed that the evidence at the adjudicatory hearing established that Grandmother had been leaving Xavier with third parties for "extended" periods of time, during which time Xavier was not attending school. The court also noted that Grandmother was under tremendous stress at this time due to the recent loss of three family members. Her physical health was poor (and continued to be so at the time of the dispositional hearing) and her behavior was erratic. She was unable to explain where she had been, and she appeared at Xavier's school looking for him when he had not attended that school in a week or more.

{¶42} The court found that Grandmother made a good faith effort in many areas of her case plan for reunification but that her own testimony highlighted her mental and physical limitations that made caring for Xavier on a full-time basis impossible. The court found that these mental and physical limitations were what led to Xavier's removal and those limitations continued to exist. The court noted that Grandmother "consistently failed drug screens during the case which if nothing else shows [her] inability to regulate her own

---

6. Certain comments made by the juvenile court at the dispositional hearing indicate that some of the allegations made by "family and friends" against Grandmother were unfounded. The record of the adjudicatory hearing is not before us and the details on this issue were not elaborated upon during the dispositional hearing.

medicine."

**{¶43}** The court noted that the testimonies of Dr. Smiley and Caseworker Stephenson, as well as Grandmother's closing argument, made clear that Grandmother "still struggles to accept any responsibility for the situation and developmental delays of the child under her care." The court found this lack of acknowledgement "concerning," and noted the "overwhelming" evidence of improvement of Xavier's physical and mental development while under Mary's care.

**{¶44}** The juvenile court awarded legal custody to Mary after concluding it was "clear" that being placed in Mary's legal custody was in Xavier's best interest. The juvenile court also ordered that Grandmother should have visitation with Xavier at Mary's discretion.

## II. Law and Analysis

**{¶45}** Grandmother appealed, raising the following sole assignment of error:

**{¶46}** IN A CHILD CUSTODY CASE, THE TRIAL COURT ABUSED ITS DISCRETION IN GRANTING LEGAL CUSTODY OF THE CHILD TO A RELATIVE.

**{¶47}** Grandmother contends that the juvenile court abused its discretion by granting legal custody of Xavier to Mary. Grandmother argues that the evidence demonstrated that it was in Xavier's best interest that he be returned to her custody. Grandmother further contends that the court failed to consider Xavier's wishes.

## A. Applicable Law and Standard of Review

**{¶48}** Pursuant to R.C. 2151.353(A)(3), if a child is adjudicated an abused, neglected, or dependent child, the juvenile court may award legal custody of the child "to either parent or to any other person who, prior to the dispositional hearing, files a motion requesting legal custody of the child[.]" Legal custody may be awarded to a nonparent upon a demonstration by a preponderance of the evidence that granting legal custody to the nonparent is in the child's best interest. *In re L.C.*, 12th Dist. Warren No. CA2019-08-086,

2020-Ohio-4629, ¶ 14. A preponderance of the evidence is evidence that is of a greater weight or more convincing than the evidence which is in opposition to it. *In re K.M.*, 12th Dist. Butler No. CA2019-01-015, 2019-Ohio-1833, ¶ 37.

**{¶49}** R.C. 2151.353(A) does not independently set forth factors that a court must consider in determining the child's best interests in a request for legal custody. *In re F.B.*, 12th Dist. Brown No. CA2021-03-002, 2022-Ohio-499, ¶ 43. In determining the best interests of the child, the juvenile court must consider all relevant factors. *In re A.M.W.*, 12th Dist. Butler No. CA2021-12-159, 2022-Ohio-2913, ¶ 18. A court may therefore consider the relevant best interest factors set forth in either R.C. 3109.04(F) or R.C. 2151.414(D) in determining the best interest of the child. *In re K.S.*, 12th Dist. Warren Nos. CA2019-01-009 and CA2019-02-015, 2019-Ohio-2384, ¶ 37. R.C. 3109.04(F)(1) provides that

> In determining the best interest of a child pursuant to this section, * * * the court shall consider all relevant factors, including, but not limited to:
>
> (a) The wishes of the child's parents regarding the child's care;
>
> (b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;
>
> (c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;
>
> (d) The child's adjustment to the child's home, school, and community;
>
> (e) The mental and physical health of all persons involved in the situation;

R.C. 2151.414(D)(1) provides that

> In determining the best interest of a child * * *, the court shall

consider all relevant factors, including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶50} The juvenile court enjoys broad discretion in custody proceedings. *In re L.W.*, 12th Dist. Preble No. CA2020-12-019, 2021-Ohio-2461, ¶ 31. As a result, the standard of review in custody decisions is whether the juvenile court abused its discretion. *In re P.B.*, 12th Dist. Warren No. CA2019-10-108, 2021-Ohio-414, ¶ 14. Abuse of discretion connotes more than an error of law or judgment; an abuse of discretion instead implies that the juvenile court's attitude was unreasonable, arbitrary, or unconscionable. *In re K.G.*, 12th Dist. Clinton No. CA2020-11-017, 2021-Ohio-2154, ¶ 19. The discretion afforded to a juvenile court in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. *C.A. v. H.S.*, 12th Dist. Fayette No. CA2019-09-021, 2020-Ohio-4352,

¶ 9. A reviewing court must not substitute its judgment for that of the juvenile court when applying the abuse of discretion standard. *In re J.W.*, 12th Dist. Butler No. CA2019-07-108, 2020-Ohio-322, ¶ 23.

## B. Legal Custody Analysis

{¶51} Grandmother contends that the juvenile court abused its discretion by failing to consider the statutory best interest factors. However, "consideration" of the best interest factors "does not require a juvenile court to expressly discuss each of the best-interest factors." *In re A.M.*, 166 Ohio St.3d 127, 2020-Ohio-5102, ¶ 31. Although "the better practice is for the juvenile court to discuss them so there can be no question that each factor was considered," the court is not required to do so. *In re K.P.*, 12th Dist. Preble No. CA2021-11-016, 2022-Ohio-1347, ¶ 39. Instead, a reviewing court must simply "be able to discern from the magistrate's or juvenile court's decision and the court's judgment entry that the court satisfied the statutory requirement that it consider the enumerated factors." *In re A.M.* at ¶ 31. It is clear from our review of the record that the juvenile court considered the relevant best interest factors, even though it did not do so explicitly.

{¶52} Initially, Grandmother contends that the record "fails to provide any information, competent, credible, or otherwise, either directly by the child or through the guardian ad litem regarding the child's wishes." However, as described previously, Dr. Smiley, Caseworker Stephenson, and Guardian ad Litem Triplett all testified as to Xavier's wishes. All agreed that Xavier was adamant that he wished to live with Mary and did not wish to live with Grandmother. Although the juvenile court's decision did not explicitly state Xavier's desire, it is clear the from the court's decision that it considered the testimony of these witnesses. Accordingly, the juvenile court did not fail to take into account Xavier's wishes.

{¶53} Grandmother also challenges the juvenile court's consideration of other best

interest factors. Grandmother contends that the court failed to consider the bond that existed between Grandmother and Xavier. *See* R.C. 3109(F)(1)(c); R.C. 2151.414(D)(1)(a).

{¶54} There is no suggestion in the juvenile court's decision that it failed to consider the bond between Grandmother and Xavier. In fact, the court specifically noted that Grandmother's "love for the child cannot be challenged." The court also acknowledged that Grandmother had made progress with respect to her case plan. Nonetheless, the court found Grandmother had "mental and physical health limitations which make caring for [Xavier] on a full-time basis almost impossible." We perceive no abuse of discretion regarding the court's consideration of the relationship between Xavier and Grandmother in rendering its decision on legal custody.

{¶55} Grandmother next contends that the court failed to consider Xavier's custodial history in rendering its decision. *See* R.C. 2151.414(D)(1)(c). She notes that she was Xavier's primary legal custodian from 2015 through removal and that the court removed Xavier due to concerns over Grandmother's health after she suffered the loss of multiple family members. Grandmother adds that the court never placed Xavier in the temporary custody of BCDJFS but rather, the court placed him with a relative while BCDJFS held protective supervision.

{¶56} Grandmother does not articulate how these facts demonstrate that the court abused its discretion in granting legal custody of Xavier to Mary. Xavier's custodial history was not a critical factor in this case. Rather, the best-interest analysis was primarily focused on whether Grandmother had the physical and mental ability to care for Xavier and which nonparent – Mary or Grandmother – was best capable of providing for Xavier in a legal custody setting. As will be discussed in greater detail below, the evidence weighed in favor of granting legal custody to Mary.

**{¶57}** Grandmother finally contends that the court failed to consider Xavier's need for a legally secure permanent placement. *See* R.C. 2151.414(D)(1)(d). However, a grant of legal custody is not a permanent placement like a grant of permanent custody. *See In re M.M.*, 2011-Ohio-3913, at ¶ 7. In the context of this argument challenging legal custody, Grandmother essentially argues that she was able to provide Xavier with a legally secure permanent placement because she addressed all of BCDJFS's concerns with her mental health and parenting abilities and remedied those issues. She notes that she completed parenting classes and anger management courses. She states that BCDJFS's concerns with her drug use were unfounded as the drugs she tested positive for had been prescribed to her. Grandmother explains away her decision to leave Xavier with another person as being justified by her need to visit a grandson in a hospital.

**{¶58}** However, the juvenile court expressly took note of the progress that Grandmother made upon the case plan services provided by BCDJFS. The court found that *despite* this progress, Grandmother had not remedied those issues involving her physical and mental health that led to Xavier's removal.

**{¶59}** The specific and primary concern that led to removal was evidence that Grandmother was leaving Xavier with strangers for extended periods of time. Evidence corroborated this allegation, as Mary testified that Grandmother left Xavier with her for two weeks despite Xavier being a stranger to her at the time.

**{¶60}** To address this concerning issue and others, including erratic behavior and possible prescription drug misuse, BCDJFS referred Grandmother for parenting classes and therapy. Despite completing these assignments, Dr. Smiley opined that Grandmother effectively made no progress on those aspects of her parenting behavior which would indicate whether she was a threat for abusing a child. In sum, Grandmother failed to demonstrate that was able to provide a safe and healthy environment for Xavier.

{¶61} On the other hand, there was ample evidence presented that Xavier thrived while under Mary's care. As testified to by child educator Blackburn, many of the behavioral and educational issues that Xavier displayed at the time of his removal were remedied during Xavier's time with Mary, and this progress was directly correlated to Mary's efforts working with Xavier. Xavier could not recite his ABCs, count numbers, or write his name at removal. By the time of the dispositional hearing, Xavier was reading, he could recognize numbers, count to 120, and he could count by tens. He could even tell time on a digital clock.

{¶62} After having reviewed the complete record of proceedings below, the juvenile court did not abuse its discretion in finding that a grant of legal custody to Mary was in Xavier's best interest and that granting legal custody to Grandmother would not have been in Xavier's best interest. Accordingly, we overrule Grandmother's sole assignment of error.

### III. Conclusion

{¶63} Having overruled Grandmother's sole assignment of error, we affirm the juvenile court's judgment.

{¶64} Judgment affirmed.

M. POWELL, P.J., and PIPER, J., concur.